1 **WO**

2

3

4

5

6

7 **IN THE UNITED STATES DISTRICT COURT**

8 **FOR THE DISTRICT OF ARIZONA**

9

10 Daniel Wayne Cook,                  )     No.  CV-97-146-PHX-RCB
                                     )
11              Petitioner,          )
                                     )
12 vs.                               )     **MEMORANDUM OF DECISION**
                                     )     **AND ORDER**
13 Dora Schriro, et al.,[1]          )
                                     )
14              Respondents.         )
   ──────────────────────────────── )
15

16        Petitioner Daniel Wayne Cook ("Petitioner") filed a Petition for Writ of Habeas

17 Corpus alleging that he is imprisoned and sentenced to death in violation of the United States

18 Constitution.  His amended petition presented twenty-one (21) claims.  (Dkt. 18.) [2]  By Order

19 dated September 19, 1999, the Court determined that Claims 2, 3(b) (in part), 4, 5, 6 (in part),

20 8, 9, 10, 14, 15, 16, and 21 (in part) were entitled to merits review, that Claim 1 needed

21 additional briefing on its procedural status and the merits, and that all other claims were

22 procedurally barred.  (Dkt. 39.)  This Order reexamines Claim 1 and the merits of the

23 remaining claims.  For the reasons stated herein the Court concludes that Petitioner is not

24 entitled to habeas relief.

25

26 ────────────────

27    [1]  Dora Schriro, Director of the Arizona Department of Corrections, is substituted
   pursuant to Fed. R. Civ. P. 25(d)(1).

28
      [2]  "Dkt." refers to the documents in this Court's file.  "R.O.A." refers to state court's
   record of appeal (Case No. CR-88-0301-AP). "R.T." refers to the court reporter's transcript.

# BACKGROUND

On July 6, 1988, a jury found Petitioner guilty of two counts of first-degree murder. The trial court sentenced Petitioner to death for both murder convictions.[3]

Petitioner and John Matzke shared an apartment together in Lake Havasu City, Arizona. At the time of the murders, one of the victims, Carlos Cruz Ramos, had recently moved into the apartment. Petitioner, Matzke, and the victims, Cruz Ramos and Kevin Swaney, worked or had worked together at a local restaurant.

On July 19, 1987, Petitioner and Matzke devised a plan to rob Cruz Ramos. While Matzke distracted him, Cook robbed Cruz Ramos of just under $100. Shortly thereafter, Cruz Ramos noticed that his money was missing and asked Petitioner and Matzke about it. Allegedly trying to help him find it, the two lured Cruz Ramos into Petitioner's bedroom, where he was gagged and tied to a chair. The Arizona Supreme Court detailed the subsequent events:

> Over the course of the next six or seven hours, Cruz Ramos was cut with a knife, beaten with fists, a metal pipe and a wooden stick, burned with cigarettes, sodomized, and had a staple driven through his foreskin. Matzke suggested that they kill Cruz Ramos because they could not let him go. Cook replied that Cruz Ramos should be killed at midnight, "the witching hour." When midnight arrived, Matzke first tried to strangle Cruz Ramos with a sheet. Matzke then took Cruz Ramos out of the chair, put him on the floor, and pushed down on his throat with a metal pipe. According to Matzke, because Cruz Ramos still would not die, Cook pressed down on one end of the pipe while Matzke pressed on the other. Finally, Matzke stood on the pipe as it lay across Cruz Ramos' throat and killed him.

> Matzke and Cook later dressed Cruz Ramos and put him in the closet of Matzke's bedroom. The autopsy revealed that Cruz Ramos had suffered severe lacerations and contusions as a result of his beating, that he had been cut on the chest, and that his stomach and genitals had been burned. The autopsy also revealed that Cruz Ramos had two puncture holes in his foreskin and that his anus was dilated, although no semen was detected.

> Kevin Swaney was a sixteen-year-old runaway and sometime guest at the apartment. He was a dishwasher at the restaurant where the others worked. Shortly after 2:00 a.m., approximately two hours after Cruz Ramos' death,

---

[3] Except where otherwise indicated, the following factual summary is taken from the Arizona Supreme Court opinion upholding Petitioner's conviction and sentence. State v. Cook, 170 Ariz. 40, 821 P.2d 731 (1991).

Swaney stopped by the apartment.  Cook initially told Swaney to leave, but subsequently invited him inside.  Cook and Matzke told Swaney they had a dead body upstairs and, according to Matzke, Cook took Swaney upstairs and showed him Cruz Ramos' body.  Swaney was crying when he and Cook returned downstairs. Cook reportedly told Swaney to undress, and Swaney complied, and Cook and Matzke then gagged him and tied him to a chair in the kitchen.  Matzke said he told Cook that he would not witness or participate in Swaney's torture.  Matzke then went into the living room and fell asleep in a chair.

Cook later woke Matzke, who said he saw Swaney bound and gagged, sitting on the couch, crying.  Cook told Matzke he had sodomized Swaney and that they had to kill him.  Matzke said they tried to strangle Swaney with a sheet, but Matzke's end kept slipping out of his hands.  Cook then reportedly stated "this one's mine," placed Swaney on the floor, and strangled him.  He carried Swaney's body upstairs and put him in the closet with Cruz Ramos.

The autopsy revealed that Swaney's anus was dilated and semen was present, although the identity of the donor could not be ascertained. Matzke's fingerprints were found on the knife used to cut Cruz Ramos' chest, but no identifiable fingerprints were found on the metal pipe or wooden stick. Cook's fingerprints were found on the chair to which Cruz Ramos had been tied, the closet door, and the stapler. His semen was found on the strips that had been torn from his bedsheets. There was no other physical evidence of Cook's participation.

Cook, 170 Ariz. at 45-46, 821 P.2d at 736-37.

On July 21, 1987, John Matzke went to the Lake Havasu City Police Department and confessed to the two murders.[4]  Officers then searched the apartment, pursuant to Matzke's consent.  At the apartment they arrested Petitioner and located the two bodies.

Petitioner was brought to the police station and interviewed.[5]  When asked how the two bodies had ended up in the apartment, Petitioner reportedly replied, "We got to partying; things got out of hand; now two people are dead." Id.  When asked how they died, Petitioner explained that, "My roommate killed one and I killed the other."[6]  Id.

---

[4]  A portion of Matzke's confession was videotaped and presented to the jury.

[5]  Petitioner's interview was not recorded.  During the interview Petitioner invoked his right to remain silent. See discussion infra at pp. 41-42.

[6]  Petitioner made these statements to Detective David Eaton.  According to Detective Eaton's testimony at the evidentiary hearing on September 21, 1987, Petitioner explained that the victims were choked and that he killed "Kevin."  (R.T. 9/21/87.)

On October 30, 1987, Matzke pleaded guilty to one count of second-degree murder and agreed to testify against Petitioner.  In exchange the prosecution dropped the two first-degree murder charges against Matzke.  <u>Cook</u>, 170 Ariz. at 57, 821 P.2d at 748.

Petitioner was initially represented by appointed counsel, Claude Keller.  Mr. Keller moved for a mental examination pursuant to Rule 11 of the Arizona Rules of Criminal Procedure.  (R.O.A. 24.)  Daniel W. Wynkoop, Ed.D., and Eugene R. Almer, M.D., each performed an examination.  Drs. Wynkoop and Almer determined that Petitioner was sane at the time of the offenses and competent to stand trial. (R.O.A. 27, 33.)

In April 1988, prior to trial, Petitioner decided to waive his right to counsel.  After strongly advising Petitioner against representing himself, and stressing the numerous difficulties self-representation was likely to present, the court accepted Petitioner's waiver of counsel as knowing, intelligent, and voluntary; the court then appointed Mr. Keller to serve as advisory counsel.

Prior to trial, the court granted the state's motion to preclude all evidence of intoxication.  The state had decided to proceed on the theory that Petitioner had committed murders "knowingly" as opposed to "intentionally."  A.R.S. § 13-1101(1).  Therefore, pursuant to A.R.S. § 13-503, evidence of intoxication, which might negate intent but not knowledge, was precluded. (<u>See</u> R.T. 6/24/88 at 15-18.)

The jury convicted Petitioner on both counts of first-degree murder.  At the sentencing hearing Petitioner, who continued to represent himself, presented no mitigating evidence and indicated that the only penalty he would accept was death.  (R.T. 8/8/88 at 4.)  The state contended that the murder of Cruz Ramos was committed for pecuniary gain under § 13-703(F)(5), and that it was committed in an especially cruel, heinous, or depraved manner under § 13-703(F)(6).  The state also argued that Swaney's murder was especially cruel, heinous, or depraved.  The court found these aggravating factors to exist and, *sua sponte,* found an additional aggravating factor in both murders – that they were committed during the commission of another homicide under § 13-703(F)(8).  The trial court found no

4

1   mitigating factors, and sentenced Petitioner to death on each count.

2       On direct appeal, the Arizona Supreme Court affirmed Petitioner's convictions and

3   sentences. Cook, 170 Ariz. at 65, 821 P.2d at 756.  After exhausting state post-conviction

4   remedies, on January 24, 1997, Petitioner filed for habeas relief in this Court.

5                  **LEGAL STANDARD FOR FEDERAL HABEAS RELIEF**

6       Petitioner filed his habeas petition following the enactment of the Antiterrorism and

7   Effective Death Penalty Act of 1996 ("AEDPA").  Therefore, the provisions of the AEDPA

8   apply to this case. Jeffries v. Wood, 114 F.3d 1484, 1495-96 (9th Cir. 1997) (en banc).

9       AEDPA, which revised the standards of deference federal courts must accord state

10  court decisions, provides in pertinent part:

11          An application for a writ of habeas corpus on behalf of a person in custody
            pursuant to the judgment of a State court shall not be granted with respect to
12          any claim that was adjudicated on the merits in State court proceedings unless
            the adjudication of the claim--
13          (1) resulted in a decision that was contrary to, or involved an unreasonable
            application of, clearly established federal law, as determined by the Supreme
14          Court of the United States; or
            (2) resulted in a decision that was based on an unreasonable determination of
15          the facts in light of the evidence presented in the State Court proceeding.

16  28 U.S.C. § 2254(d).

17      AEDPA further provides that any factual determinations made by the state courts are

18  presumed to be correct. 28 U.S.C. § 2254(e)(1).  Petitioner has the burden of rebutting this

19  presumption of correctness by clear and convincing evidence. Id.; Miller-El v. Cockrell, 537

20  U.S. 322, 340 (2003).

21      Under § 2254(d)(1), a state prisoner may obtain federal habeas corpus relief with

22  respect to a claim adjudicated on the merits in state court only if the state court's ruling was

23  either (1) contrary to clearly established federal law, as determined by the Supreme Court of

24  the United States, or (2) involved an unreasonable application of clearly established federal

25  law, as determined by the Supreme Court of the United States. Williams v. Taylor, 529 U.S.

26  362, 404-05 (2000); Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2004). These clauses

27  have independent meanings, but in some cases they may overlap. Williams, 529 U.S. at 408;

28

5

Van Tran v. Lindsey, 212 F.3d 1143, 1150 (9th Cir. 2000), overruled on another ground by Lockyer v. Andrade, 538 U.S. 63 (2003).

To assess a habeas claim under § 2254(d)(1), the Court must identify the "clearly established Federal law," if any, that governs the sufficiency of the claim on habeas review. "Clearly established" federal law includes the holdings of the Supreme Court at the time the petitioner's state court conviction became final.  See Williams v. Taylor, 529 U.S. 362, 390 (2000).  Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. Id. at 381.  "The threshold question under AEDPA is whether [petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." Id. at 390.  When determining what the clearly established federal law is, federal courts look at the holdings of the United States Supreme Court as of the time of the state court's decision. Id. at 412.  However, Ninth Circuit law may still be considered "for its persuasive authority in applying Supreme Court law." Van Tran, 212 F.3d at 1154; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003), cert. denied, 540 U.S. 968 (2003).

A state court's decision is "contrary to" clearly established Supreme Court precedent if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court "confronts a set of facts that are materially indistinguishable" from a Supreme Court case, but reaches a different result. Williams, 529 U.S. at 405-06, 412-13; Andrade, 538 U.S. at 73; Clark, 331 F.3d at 1067.  A state court's ruling is "contrary to" Supreme Court precedent if it is diametrically different, opposite in character or nature, or mutually opposed to, a Supreme Court holding. Williams, 529 U.S. at 405.

A state court decision involves an "unreasonable application" of Supreme Court precedent if (1) the state court identifies the correct governing rule, but then applies it to a new set of facts in an unreasonable way, or (2) the state court either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply

6

or unreasonably refuses to extend that principle to a new context where it should apply. Id. at 407-09; Wiggins v. Smith, 539 U.S. 510, 520 (2003); Clark, 331 F.3d at 1067. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable . . . an unreasonable application of federal law is different from an incorrect or erroneous application of federal law." Williams, 529 U.S. at 409, 412; Lockyer, 538 U.S. at 75; Wiggins, 539 U.S. at 520; Clark, 331 F.3d. at 1067-68. Thus, a federal court may not issue a writ even when it concludes, based on its independent judgment, that the state court, in reaching its decision, applied clearly established federal law erroneously or incorrectly. Williams, 529 U.S. at 412-13; Lockyer, 538 U.S. at 76; Woodford v. Visciotti, 537 U.S. 19, 24, 27 (2002), reh'g denied, 537 U.S. 1149 (2003).

In discussing the characteristics of "clearly established federal law," the Supreme Court has recognized "that if a habeas court must extend a rationale before it can apply to the facts at hand then the rationale cannot be clearly established at the time of the state-court decision" and that "2254(d)(1) would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law." Yarborough v. Alvarado, 541 U.S. 652, 666 (2004). The Court acknowledged that "the difference between applying a rule and extending it is not always clear," but noted that "[c]ertain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt." Id.

Under § 2254(d)(2), a state prisoner may obtain federal habeas corpus relief with respect to a claim adjudicated on the merits in state court only if the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Factual determinations by state courts are presumed correct in the absence of convincing evidence to the contrary. Miller-El, 537 U.S. at 340. "A state court decision 'based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court

proceeding.'" <u>Davis</u>, 384 F.3d at 638 (quoting <u>Miller-El</u>, 537 U.S. at 340).

Application of the foregoing standards presents difficulties when the state court decided the merits of a claim without providing its rationale. <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003); <u>Pirtle v. Morgan</u>, 313 F.3d 1160, 1167 (9th Cir. 2002), <u>cert. denied</u>, 539 U.S. 916 (2003); <u>Delgado v. Lewis</u>, 223 F.3d 976, 981-82 (9th Cir. 2000) ("<u>Delgado II</u>"). In those circumstances, a federal court independently reviews the record to assess whether the state court decision was objectively unreasonable under controlling federal law. <u>Himes</u>, 336 F.3d at 853 ("The 'independent review' of the *record* required when a state court supplies no *ratio decidendi* must be carefully distinguished from 'independent review' of the *constitutional question . . .* ") (emphasis in original); <u>Pirtle</u>, 313 F.3d at 1167. Although the record is reviewed independently, a federal court nevertheless defers to the state court's ultimate decision. <u>Pirtle</u>, 313 F.3d at 1167 (citing <u>Delgado II</u>, 223 F.3d at 981-82); <u>see also</u> <u>Himes</u>, 336 F.3d at 853. Only when a state court did not decide the merits of a properly raised claim will the claim be reviewed *de novo*, because in that circumstance "there is no state court decision on [the] issue to which to accord deference." <u>Pirtle</u>, 313 F.3d at 1167 (following Third and Fifth Circuits); <u>see also</u> <u>Nulph v. Cook</u>, 333 F.3d 1052, 1056-57 (9th Cir. 2003).

## DISCUSSION

**Claim 1:** **Petitioner's request to represent himself at trial because he was not receiving competent representation from his court-appointed lawyer was not a knowing, voluntary, informed waiver of his Sixth Amendment right to the assistance of effective counsel.**

The Court's September 17, 1999, Order left this Claim's procedural status unresolved, and requested additional briefing on both the procedural issue – i.e., "whether Arizona had an adequate procedural default rule regarding ineffective assistance of counsel claims as of March 1990" – and the Claim's merits. (Dkt. 39 at 10.) However, rather than analyze whether Claim 1 is procedurally barred, the Court concludes that judicial economy is best served by considering the Claim's merits. <u>See</u> 28 U.S.C. § 2254(b)(2); <u>Rhines v. Weber</u>, 544

U.S. 269, 125 S.Ct. 1528, 1535 (2005) (holding that a stay is inappropriate in federal court to allow claims to be raised in state court if they are subject to dismissal under § 2254 (b)(2) as "plainly meritless").

Petitioner alleges that his decision to waive counsel was not voluntary because he was forced to choose between proceeding with incompetent counsel or representing himself. He further contends that the trial court should have inquired into his dissatisfaction with counsel as part of the colloquy the court was required to conduct under Faretta v. California, 422 U.S. 806 (1975).

Petitioner's main argument does not assert that the trial court did not make him fully aware of the dangers and disadvantages of self-representation; instead, Petitioner contends that the trial court had an additional obligation to inquire into the reasons he was choosing to waive counsel. Petitioner contends that "the court failed to conduct the constitutionally required inquiry into the reasons for defendant's dissatisfaction with counsel so that he could give the defendant a meaningful (and constitutional) alternative to self-representation." (Dkt. 69 at 32.) Based on principles derived from Faretta v. California, Petitioner claims that he was forced to choose between incompetent counsel and self-representation and consequently denied his Sixth Amendment right to effective assistance of counsel. (Id.)

On April 11, 1988, Petitioner filed a "Motion to Waive Counsel." (R.O.A. 54.) The motion requested the court to appoint his present counsel, Mr. Keller, as advisory counsel. (Id.) On April 21, 1988, the court held a hearing to address the motion. The court first asked Petitioner if he still wished to represent himself, and Petitioner replied that he did. (R.T. 4/21/88 at 2.) Next, the court explained to Petitioner that, "you don't have to tell me anything about why you want to represent yourself" and that Petitioner had "an absolute right to represent yourself or waive counsel if I find that you are competent to do so." (Id.) The court then asked Petitioner if he had anything to add to the information in his motion. Petitioner replied,

Yes, sir. If you're amenable to my waiver of counsel, I would ask that you not

1
2

> appoint Mr. Keller as my legal advisor.  Mr. Keller has worked hard for my
> defense; cares about the outcome of the trial.  My personal beliefs [sic] is that
> he cannot advise me according to my defense.

3  (Id. at 3.)

4  Petitioner and the court next discussed the appointment of advisory counsel, with

5  Petitioner indicating that if the court would not appoint Petitioner's choice for advisory

6  counsel he would "have to swing it on my own."  (Id. at 3-4.)  At this point Mr. Keller

7  explained that he had contemplated withdrawing from the case for health reasons.  (Id. at 5.)

8  After hearing comments from the prosecutor regarding the necessity of obtaining a

9  knowing, intelligent, and voluntary waiver, and the difficulty Petitioner would have

10  presenting a defense without a trained lawyer, the court again addressed Petitioner:

11
12
13

> Mr. Cook, I believe that the cases place upon me an affirmative obligation to
> do everything that I possibly can to try to talk you out of representing yourself
> and because of that, I'm going to go through probably the next 20 or 30
> minutes and try to explain to you some of the problems that I perceive in your
> representing yourself.

14  (Id. at 6.)  The court proceeded to provide for Petitioner, in the course of 17 transcript pages,

15  a comprehensive and detailed account of the "perils, pitfalls or problems in self-

16  representation," indicating on multiple occasions that without an attorney Petitioner faced

17  certain conviction.  (Id. at 6-23.)  The court then asked Petitioner if he still wanted to

18  represent himself.  (Id. at 23.)  Petitioner replied, "I feel very strongly about that, your Honor,

19  yes."  (Id.)

20  Upon further questioning Petitioner indicated that he was 26 years old and a high

21  school graduate; that he had been treated in the past for depression but had not been on

22  medication for the past sixty days; and that he had no legal training but had represented

23  himself in a justice court proceeding.  (Id. at 24-25.)  The court then explained, echoing

24  concerns expressed by the prosecutor, the particular difficulties Petitioner would face

25  representing himself in the penalty stage of a capital case.  (Id. at 30-32.)  Again, the court

26  inquired if Petitioner still wished to represent himself.  Petitioner answered,

27
28

> Just I plan on representing myself through the entire procedure of this court.

I have no inclination to wait until the last moment and say to you I want an attorney. I know what I'm doing. I feel I can represent myself adequately and I am pretty much aware of what needs to be done in a courtroom. Granted, I don't know everything that needs to be done but as far as representing myself, I feel that I can do a pretty adequate job, your Honor.

(Id. at 33.)

The court then stated that, "I find at this time that you have voluntarily, knowingly, and intelligently given up your right to be represented by an attorney in this matter." (Id. at 34.) The court granted Petitioner's motion to represent himself and appointed Mr. Keller as advisory counsel. (Id.) On appeal, the Arizona Supreme Court found that Petitioner's waiver of his right to counsel was knowing and voluntary. Cook, 170 Ariz. at 40, 821 P.2d at 739. The court was not presented, however, with the specific argument set forth by Petitioner in Claim 1, which Petitioner did not raise until a supplemental petition for post-conviction relief ("PCR"). (R.O.A. 129.)

The PCR court rejected Petitioner's claim after holding an evidentiary hearing.[7] In denying the claim the court first responded to the contention that trial counsel was ineffective, expressing skepticism about Petitioner's ability to meet his burden under either prong of the Strickland test. (R.T. 2/3/95 at 25–28.) The court then addressed the merits of Petitioner's claim that he was forced him to represent himself due to trial counsel's

---

[7] At the evidentiary hearing Petitioner presented witnesses who testified regarding Mr. Keller's reputation among members of the Mohave County defense bar. (R.T. 12/2/94.) Mr. Keller also testified, acknowledging that at the time he represented Petitioner he was suffering from bi-polar disorder and drinking heavily. (Id. at 87-93.) Mr. Keller further testified that it was his recollection that Petitioner chose to represent himself because "he would like to – to have an opportunity to explain his situation to the jury without being a witness." (Id. at 97.)

Petitioner testified at the evidentiary hearing. He stated that he came to believe that Mr. Keller was not competent to represent him, that he believed his only options were to represent himself or continue with Mr. Keller, and that if the trial court had asked he would have explained that he waived counsel because he "felt that Mr. Keller was not competent to put on a proper defense for this case." (Id. at 150-53.) Petitioner's main concern was that Mr. Keller focused only on the insanity defense, which Petitioner felt was no longer viable after the Rule 11 reports found that he was sane and competent to stand trial. (Id. at 144-46.)

incompetence and that the trial court had a duty to inquire into Petitioner's reasons for waiving his right to counsel. (Id. at 28-30.) Having assessed the caselaw cited by Petitioner, the court concluded:

> I just don't believe that I am convinced that there is any authority for the proposition that I, as the trial judge, had an obligation to inquire into the defendant's motive for wanting to waive counsel and because of that, it is my ruling that the Defendant is not entitled to relief on this claim.

(Id. at 30.)

For the reasons set forth below, this Court finds that the PCR court's ruling was neither contrary to, nor an unreasonable application of, clearly established federal law.

In Faretta the Supreme Court held that a defendant had the right to waive his Sixth Amendment right to counsel and proceed with self-representation. 422 U.S. at 834. The Faretta Court also held that because a defendant choosing self-representation relinquishes benefits associated with the right to counsel, his waiver of counsel must be made knowingly and intelligently. Id. at 835. The Court described the purpose of the knowing and voluntary inquiry as ensuring that the defendant waiving counsel actually understands the dangers and disadvantages of self-representation. Faretta, 422 U.S. at 835. Consequently, Faretta requires that trial courts discuss with defendants the pitfalls of self-representation to ensure that defendants are aware of the potential consequences of their decision and that the choice to waive counsel is made with "eyes open." Id. (quotation omitted).

Petitioner claims that under AEDPA the state trial court unreasonably failed to extend Faretta to encompass a requirement that the court inquire into the reasoning behind a defendant's decision to waive counsel and represent himself. (Dkt. 69 at 35.)

Faretta does not impose an obligation on the state courts to inquire of a defendant why he is choosing to waive his right to counsel. 422 U.S. at 835. Absent an affirmative obligation imposed on the states by a holding of the United States Supreme Court, the trial court did not err in failing to inquire of Petitioner why he wished to waive counsel and proceed with self-representation.

1    In the absence of controlling Supreme Court precedent, this Court cannot create a new

2    legal rule and apply it retroactively.   Neither at present nor at the time the trial court made

3    its decision did clearly established federal law require a trial court to inquire into a

4    defendant's potential dissatisfaction with counsel prior to allowing the defendant to waive

5    counsel and proceed *pro se*.   The Court further finds that the argument advanced in

6    Petitioner's claim represents an extension rather than an application of the principles set forth

7    in Faretta.  Alvarado, 541 U.S. at 666.

8    This Court's conclusion that the trial court did not err is supported by Ninth Circuit

9    precedent.   Under Van Tran Ninth Circuit law may be utilized to help determine what

10   Supreme Court law is "clearly established."  Van Tran, 212 F.3d at 1154.

11   In United States v. Robinson, 913 F.2d 712, 716 (9th Cir. 1990), the Ninth Circuit

12   specifically rejected the argument that when a defendant moves to proceed *pro se*, the district

13   court has a Sixth Amendment obligation to inquire into the sources of his dissatisfaction with

14   counsel before allowing defendant to waive counsel.  The court found that the defendant had

15   made an unequivocal, knowing, and voluntary waiver of his right to counsel, despite his

16   indication that he felt "forced" to represent himself because his only alternative was to

17   proceed with appointed counsel with whom he had disagreements.  Id. at 714, 715.

18   The Robinson court focused entirely on circuit precedent in reaching the conclusion

19   that the district court was not obligated to initiate an inquiry into the defendant's possible

20   dissatisfaction with counsel.  Id.  The court did not address or discuss any governing

21   Supreme Court precedent to the effect that courts have an obligation under Faretta to inquire

22   into a defendant's dissatisfaction with counsel when a defendant moves to proceed *pro se*.[8]

23

24

---

25   ⁸    The Ninth Circuit reached the same conclusion in Whaley v. Thompson, 210
26   F.3d 388 (9th Cir. 2000), cert. denied by Whaley v. Palmateer, 531 U.S. 864 (2000).  In
     Whaley the Circuit rejected the habeas petitioner's claim that the "trial court was compelled
27   to make a formal inquiry into his reasons for his satisfaction with his attorney," explaining
     that, "[o]ur circuit has not imposed such a rule, and it is not commanded by clearly
28   established federal law, as determined by the Supreme Court of the United States, as required

Id.

The cases relied upon by Petitioner, like those cited by the defendant in Robinson, support this conclusion. For example, in Crandell v. Bunnell, 25 F.3d 754, 755 (9th Cir. 1994), the defendant claimed that he was coerced into waiving his right to counsel because his appointed lawyer was incompetent. The Ninth Circuit agreed, and remanded the case to the district court for an evidentiary hearing on counsel's competence. Id. In doing so the court distinguished Robinson, where the defendant "alleged nothing amounting to attorney incompetence and hence was not entitled to an evidentiary hearing." Id. Crandell, in contrast to Robinson and Petitioner, informed the trial court, in specific detail, that he was choosing to proceed on a *pro se* basis because his appointed counsel was incompetent. Id. Crandell explained to the judge, "I do waive him as a legal representative of any kind because he has put up no defense at all for me, none whatsoever, won't even communicate with me." Id.

In United States v. Padilla, 819 F.2d 952 (10th Cir. 1987), the court recognized that a defendant forced to choose between incompetent counsel and self-representation faces "a dilemma of constitutional magnitude." Id. at 955 (internal quotation omitted). The court also observed that, "the district court should make formal inquiry into the defendant's reasons for dissatisfaction with present counsel *when substitution of counsel is requested*." Id. at 956 n.1 (emphasis added); see Robinson, 913 F.2d at 716 (distinguishing cases in which defendants moved for substitute counsel, for which there is a general requirement imposed on the district courts that they inquire into a defendant's dissatisfaction with present counsel). In Padilla the defendant informed the district court of his objections to counsels' performance, explaining that they would not "structure a defense as he directed." Id. at 956. Noting that

under federal habeas law." Id. The court also observed that Petitioner, in choosing to represent himself at trial, did not cite counsel's performance as the basis for his waiver of counsel; instead, he informed the trial judge that his decision to represent himself was based upon his desire to "question [his] accusers face-to-face." Id.

14

the "Sixth Amendment provides no right to counsel blindly following a defendant's instructions," the court rejected the defendant's request for substitute counsel, and the defendant represented himself at trial. Id. The Tenth Circuit held that the defendant's decision to proceed *pro se* was voluntary, and that "the choice given defendant between continuing with retained counsel or proceeding pro se was constitutionally permissible." Id.

In none of the cases relied upon by Petitioner, or reviewed by this Court, did the circuit court hold that prior to accepting a waiver of counsel a trial court is required to question a defendant about the quality of his counsel's performance in the absence of a request for new counsel or an indication that counsel has been ineffective. Compare Pazden v. Maurer, 424 F.3d 303, 316–17 (3d Cir. 2005) (waiver of counsel not voluntary where defendant explained to the court that he was forced to choose self-representation as the "lesser of two evils" because his attorney had not been given adequate time to prepare for trial), and Maynard v. Meachum, 545 F.2d 273, 275-76 (1st Cir. 1976) (defendant told the trial court that he wanted another lawyer and that his appointed lawyer had told him that he didn't think he, the lawyer, could handle the case), with United States v. Taylor, 113 F.3d 1136 (10th Cir. 1997) (waiver of counsel voluntary where attorney moved to withdraw from representation of defendant because defendant intended to represent himself, defendant did not seek substitute counsel, and the record did not indicate that defendant ever complained that attorney was incompetent or unprepared to provide adequate representation), and Wilks v. Israel, 627 F.2d 32 (7th Cir. 1980) (defendant who offered no explanation for his displeasure with appointed counsel was not deprived of his right to counsel when he was presented with the choice of either continuing with appointed counsel or proceeding with no counsel.)

The trial court, PCR court, and Arizona Supreme Court found that Petitioner's waiver of counsel was knowing, voluntary, and intelligent. These determinations were neither contrary to, nor an unreasonable application of, clearly established federal law. Therefore,

15

1    Petitioner is not entitled to relief on Claim 1.

2    **Claim 2:     Petitioner's decision to waive his Sixth Amendment right to counsel was**
3    **not knowing, intelligent, and voluntary because at the time he made the**
        **decision he was suffering from mental problems that rendered him**
4       **incompetent.**

5          Petitioner alleges that he was not competent to make the decision to waive counsel

6    and represent himself at trial.  He claims that the record before the trial court indicated that

7    he was incompetent and unable to exercise his right to waive counsel.  He also claims that

8    the trial court's questioning of Petitioner was not adequate to establish his competence to

9    waive counsel.  The Court rejects Petitioner's arguments based upon clearly established

10   federal law as set forth in <u>Faretta</u> and in <u>Pate v. Robinson</u>, 383 U.S. 375 (1966).

11         Under <u>Faretta</u>, before a defendant may choose self-representation, the record must

12   show that the defendant competently and intelligently waived counsel. 422 U.S. at 835.  The

13   standard for determining whether a defendant is competent to waive his right to counsel is

14   the same as that for determining whether he is competent to stand trial.  <u>Godinez v. Moran</u>,

15   509 U.S. 389, 399-400 (1993).  A defendant is competent to stand trial when he has the

16   "sufficient present ability to consult with his lawyer with a reasonable degree of rational

17   understanding and has a rational as well as factual understanding of the proceedings against

18   him." <u>Id.</u> at 396.  "The focus of a competency inquiry is the defendant's mental capacity; the

19   question is whether he has the ability to understand the proceedings." <u>Id.</u> at 401 n.12.

20         Prior to trial, Mr. Keller moved for and the trial court granted a Rule 11 competency

21   evaluation.  Petitioner was evaluated by a psychologist and a psychiatrist.  Both doctors

22   indicated that Petitioner was competent to stand trial.  (R.O.A. 27, 33.)  Additionally, due to

23   a previous head injury, Petitioner was also provided a neurological examination.  The results

24   of the neurological examination were "completely normal."[9]  (R.O.A. 52b.)

25   _____

26         [9]   The neurologist recommended that Petitioner have an EEG and CAT scan
27   performed.  Counsel for Petitioner obtained and scheduled the recommended testing, along
      with a transport order, but the testing was not completed.  (<u>See</u> R.O.A. 52; Dkt. 72.)  Shortly
28   thereafter, Petitioner moved to waive counsel.

As discussed <u>supra</u> at pp. 9-11, the trial court engaged in a lengthy on-the-record colloquy with Petitioner prior to accepting his waiver of counsel.[10]  The court considered the expert opinions that found Petitioner sane and competent to stand trial.   (R.T. 4/21/88 at 6; <u>see also</u> R.T. 1/4/88 at 2-4.)  The court also queried Petitioner about his personal history.  (<u>Id.</u> at 24-25.)  The court determined that Petitioner was competent to waive counsel.  (<u>Id.</u> at 34.)

On direct appeal the Arizona Supreme Court found that the trial court had "carefully determined that Cook was competent to waive his counsel and that Cook's decision to do so was voluntary."  <u>Cook</u>, 170 Ariz. at 48, 821 P.2d at 739.  The court agreed that Petitioner's waiver was knowing, intelligent, and voluntary, explaining that, "[w]hile Cook certainly lacked a lawyer's skills, the record demonstrates that he was intellectually competent, understood the trial process, and was capable of making – and did make – rational decisions in managing his case."  <u>Id.</u>

The state courts correctly identified <u>Faretta</u> as authority for the requirement that a defendant must be competent before he can waive counsel.  On habeas review, the state court's determination that Petitioner was competent is entitled to a presumption of correctness unless that determination is rebutted by clear and convincing evidence.  <u>See</u> 28 U.S.C. § 2254(e)(1); <u>Torres v. Prunty</u>, 223 F.3d 1103, 1110 n.6 (9th Cir. 2000).   In <u>Demonsthenes v. Baal</u>, 495 U.S. 731, 735 (1990), the Supreme Court reiterated that a state court's conclusion regarding a defendant's competency is a factual issue that is entitled to a presumption of correctness.  <u>Id.</u> (citing <u>Maggio v. Fulford</u>, 462 U.S. 111, 117 (1983) (per

---

[10]   Petitioner relies on <u>United States v. Mohawk</u>, 20 F.3d 1480 (9th Cir. 1994), to support his argument that the trial court's inquiry into his decision to waive counsel was inadequate to establish his competence.  The holding in <u>Mohawk</u> – that the record did not permit the court to conclude that the defendant's waiver was knowing and intelligent – was based upon the fact that there was "no contemporaneous record" of the proceedings in which the defendant was granted permission to represent himself and therefore the court of appeals could not "be certain how the [trial] court advised Mohawk with respect to the potential consequences of representing himself, nor what sort of appreciation of those consequences Mohawk displayed."  20 F.3d at 1484.  By contrast, the record here includes a complete transcript of the lengthy colloquy between the trial court and Petitioner.  (R.T. 4/21/88.)

1    curiam); <u>Evans v. Raines</u>, 800 F.2d 884, 887 (9th Cir. 1986) (same).[11]

2        Petitioner has not demonstrated by clear and convincing evidence that he was

3    incompetent at the time he waived his right to counsel.  The trial court appropriately relied

4    upon the Rule 11 evaluations provided by the psychologist, Dr. Wynkoop, and the

5    psychiatrist, Dr. Almer.  (R.T. 4/21/88 at 6; <u>see also</u> R.T. 1/4/88 at 2-4.)  Both doctors opined

6    that Petitioner was competent to stand trial.  (R.O.A. 27, 33.)  Additionally, during the

7    hearing the trial court made an independent determination that Petitioner had sufficient

8    reasoning ability and understood the proceedings against him.  (R.T. 4/21/88 at 33-34.)

9        Petitioner also attacks the trial court colloquy by noting that the court failed to ask if

10   he understood what was being said to him or take other steps to ensure that he comprehended

11   the information provided by the court.  (Dkt. 76 at 25.)  To establish incompetency, however,

12   Petitioner must do more than attack the manner in which the trial judge conducted the

13   colloquy; he must provide clear and convincing evidence of incompetence.  Prior to the

14   hearing, the trial judge had already had an opportunity to observe Petitioner's demeanor and

15   evaluate his <i>pro se</i> pleadings.  (<u>See</u> R.O.A. 54-56.)  These personal observations, along with

16   the information provided in the mental health evaluations, enabled the trial court to conclude

17   that Petitioner was competent to understand the proceedings against him.  (<u>See</u> R.T. 4/21/88

18   at 33-34.)

19       Based on this record, this Court finds that the state court's determination that

20   Petitioner was competent to waive counsel was not contrary to or an unreasonable application

21   of <u>Faretta</u>.  Additionally, under the standard established in <u>Maggio v. Fulford</u>, the state

22   court's determination of competence was not an unreasonable determination of the facts

23

24   ————————————

25       [11]  In <u>Torres</u>, 223 F.3d at 1107-08, the Ninth Circuit stated that application of §

26   2254(d)(2) is equivalent to the clearly erroneous standard applied to factual determinations
     made by district courts.  Therefore, under § 2254(d)(2), a habeas petitioner is not entitled to

27   relief if he has the better of two reasonable views of the facts; the federal habeas court must
     have a firm conviction that the factual determination made by the state courts is clearly

28   wrong.  <u>Id.</u> at 1108.

1   pursuant to 28 U.S.C. § 2254(d)(2).  462 U.S. at 117.

2          Next, citing Moran v. Godinez, 40 F.3d 1567 (9th Cir. 1994), superseded by 57 F.3d

3   690 (9th Cir. 1995), Petitioner alleges that his documented seizure disorder, his suicidal

4   statements, and his mental health history raised doubt that he was competent to waive

5   counsel.[12]  (Dkt. 85 at 21.)  In Moran the Ninth Circuit held that, "[d]ue process requires a

6   court to conduct a competency hearing on its own motion, before permitting a defendant to

7   waive constitutional rights, whenever a reasonable judge would be expected to have a bona

8   fide doubt as to the defendant's competence." 40 F.3d at 1571 (citing Harding v. Lewis, 834

9   F.2d 835, 856-57 (9th Cir. 1987); see Pate, 383 U.S. at 375.

10         A good faith doubt exists when there is "substantial evidence of incompetence."

11  Moran, 40 F.3d at 1572; see Amaya-Ruiz v. Stewart, 121 F.3d 486, 489 (9th Cir. 1997).

12  Evidence that may suggest incompetence includes "a defendant's demeanor before the trial

13  court, previous irrational behavior, and available medical examinations." Id. at 1571-72.

14         Neither the trial court nor the Arizona Supreme Court cited or discussed the Supreme

15  Court's holding in Pate or Ninth Circuit precedent such as Moran.  Both courts addressed the

16  issue of Petitioner's competency based on Faretta.  Absent an analysis of Pate, an

17  independent review of the record is required to determine whether the state court clearly

18  erred in its application of controlling federal law.  Delgado II, 223 F.3d at 982.  At issue is

19  whether the state court violated Petitioner's due process rights by failing to hold a

20  competency hearing.

21         The trial court relied on the Rule 11 evaluations performed, the waiver of counsel

22  hearing, and Petitioner's demeanor during pre-trial proceedings to determine that Petitioner

23

24         [12]  Although Petitioner does not cite the applicable Supreme Court precedent, Pate v.
25  Robinson, he identifies the controlling standard for reviewing whether the state courts denied
    his due process rights.  Under Pate due process requires that a state court initiate a hearing
26  on the defendant's competence to waive counsel whenever it has or should have a good faith
    doubt about the defendant's ability to understand the nature and consequences of the waiver,
27  or to participate intelligently in the proceedings and to make a reasoned choice among the
28  alternatives presented.  383 U.S. 375.

understood the nature and consequences of his decision to waive counsel.  Both Rule 11 evaluations concluded that Petitioner was competent to stand trial, able to understand the charges against him, and capable of assisting counsel in preparing and presenting a defense. (See R.O.A. 27g, 33e.)  Moreover, the results of Petitioner's neurological exam were normal.

Regarding Petitioner's "demeanor before the trial court," Moran, 40 F.3d at 1571–72, the judge offered the following comments:

> Well, I might just add something that is probably not reflected in the record. We have had a number of hearings in different cases of yours, Mr. Cook, and you have always struck me as being calm, together, not overly excitable, perhaps better equipped to represent yourself than at least a couple of other people that I can think of that I have let represent themselves in the past, you would strike me just from seeing your general demeanor in court as someone who is probably more better equipped psychologically to handle this [i.e., self-representation].

(R.T. 4/21/88 at 34.)

To obtain relief under Pate, Petitioner must establish that a good faith doubt exists regarding his competency.  Such a doubt exists when there is substantial evidence of incompetence.  See Moran, 40 F.3d at 1571.  Having performed an independent review of the record, this Court finds that the trial court was not faced with substantial evidence calling Petitioner's competence into question and requiring the court to initiate a hearing.  At the time of the hearing on his motion to waive counsel Petitioner was not under the influence of medication; his demeanor before the court was appropriate, as it had been throughout the proceedings; his *pro se* filings were coherent and he provided rational answers to the court's questions during the waiver colloquy; and two mental health evaluations found him competent to stand trial.  On this record, Petitioner has not demonstrated that a good faith doubt existed regarding his competency to waive counsel and represent himself at trial.

The trial court and Arizona Supreme Court found that Petitioner was competent to waive his right to counsel and that his choice to do so was knowing, voluntary, and intelligent.  These decisions were not contrary to, or based upon an unreasonable application of, clearly established federal law, nor were they based upon an unreasonable determination

of the facts.  Therefore, Petitioner is not entitled to relief on Claim 2.

**Claim 3(b):  The trial court's denial of Petitioner's request for continuances violated his due process rights to a fair trial.**

Petitioner alleges that the trial court's refusal to grant additional continuances was so arbitrary as to violate his due process right to a fair trial under the Fourteenth Amendment.

On July 20, 1987, a Mohave County Grand Jury indicted Petitioner on two counts of first degree murder.  On July 28, 1987, Petitioner was appointed counsel.  (R.O.A. 9.) Counsel for Petitioner moved for and was granted six continuances.  (See R.T. 6/16/88 at 4.) On April 21, 1988, Petitioner moved for and was granted the right to represent himself. Subsequently, Petitioner moved and was granted a seventh continuance.  (M.E. 6/1/88; R.O.A. 37.)  Thereafter the trial court denied further motions to continue.

On the day trial was scheduled to commence, June 27, 1988, nine weeks after he had been allowed to represent himself, Petitioner moved for an eighth continuance, asking for an additional two weeks to secure the testimony of Brian Galvin, a substance abuse counselor who had worked with Matzke.  (R.O.A. 105.)  Petitioner proffered that Galvin would testify that Matzke was a homosexual, had engaged in homosexual activities, and had previously beaten someone with a club.  (Id.)  The trial court denied Petitioner's motion, finding that Galvin's testimony would be cumulative because the facts about which he would testify could be established by other witnesses, including Matzke himself.  (R.T. 6/27/88 at 15-16.)

On July 5, 1988, at the close of his case, Petitioner requested a continuance or recess of his trial to secure the testimony of James Dominic, the manager of the restaurant where Petitioner, Matzke, and both victims worked.  (R.T. 7/5/88 at 97.)  Petitioner proffered that Dominic would "testify as to the character of Mr. Matzke, Mr. Ramos and Mr. Swaney."  (Id. at 37-38.)  The court denied Petitioner's motion, finding that the evidence regarding the victims' character would not be admissible and that further impeachment of Matzke would be cumulative and would "pale in comparison" with what Matzke himself had already admitted in court.  (Id. at 102-03.)  The trial court, however, did not rule out the possibility

21

that Petitioner might be allowed to reopen his case and present Dominic's testimony if Petitioner's interview of Dominic produced relevant and significant information. (Id. at 104.) Petitioner did not thereafter renew his request to call Dominic to the stand.

On direct appeal the Arizona Supreme Court found that the trial court did not err in denying the motions for a continuance:

> The trial judge thoroughly considered the circumstances of the requests before determining that the testimony Cook sought to secure would be irrelevant or cumulative. The court had already granted eight defense motions for continuances, including one made by Cook himself after taking over his own defense. Cook has not demonstrated any prejudice stemming from the trial court's rulings. Matzke did, in fact, admit on the stand the facts that Cook had stated he intended to establish through the unavailable witnesses. Nor did Cook inform the court whether his investigator had been able to locate Dominic, or whether Dominic had any relevant testimony to add. We therefore find that the trial court did not abuse its discretion in denying Cook's requests for continuances.

Cook, 170 Ariz. at 56, 821 P.2d at 747.

A petitioner is entitled to habeas relief if the particular state court decision is an unreasonable application of or contrary to clearly established Supreme Court precedent. Williams (Terry), 529 U.S. at 412. Supreme Court precedent with respect to the issue of whether the denial of a continuance violates due process is set forth in Ungar v. Sarifite, 376 U.S. 575 (1964).[13] In Ungar, the Court held that the concept of fairness implicit in the right to due process may dictate that an accused be granted a continuance in order to prepare an adequate defense. Id. at 589. The Ungar Court explained that there are no mechanical tests for determining whether the denial of a continuance is so arbitrary as to violate due process; rather, "[t]he answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." Id.

Under the circumstances of this case, the trial court's denial of an additional

---

[13] The Arizona Supreme Court did not discuss the applicable United States Supreme Court precedent. Absent the state court's analysis of Ungar, this Court undertakes an independent review of the record to determine whether the court clearly erred in its application of controlling federal law. Delgado, 223 F.3d at 982. At issue is whether the state court violated Petitioner's due process rights by failing to grant a continuance.

continuance was neither an unreasonable application of nor contrary to clearly established Supreme Court law. The trial court fairly considered the reasons for which Petitioner sought the continuances. More significantly, the decision to deny Petitioner's motion for a continuance did not render his trial unfair. With respect to the proposed testimony of Mr. Galvin, the absence of such testimony was not prejudicial to Petitioner because Petitioner had the opportunity to attack Matzke's credibility through cross-examination. See Armant v. Marquez, 772 F.2d 552, 556-57 (9th Cir. 1986) (in order to establish a due process violation "[a]t a minimum . . . the appellant must show some prejudice from the court's denial" of a continuance). Regarding Mr. Dominic, the trial court explicitly found that if Petitioner's interview of Dominic yielded relevant information, the court would have allowed Petitioner to present the testimony. Thereafter, Petitioner did not proffer relevant testimony for Mr. Dominic. Moreover, Petitioner was not prejudiced because Mr. Dominic would not have been able to testify about the character of Cruz Ramos and Swaney. As the trial court explained, the character of the victims was irrelevant, and any testimony by Dominic about Matzke's character would have been cumulative.

Petitioner is not entitled to habeas relief on Claim 3(b).

**Claim 4:** **The trial court violated Petitioner's rights under the Sixth, Eighth, and Fourteenth Amendments by allowing him to waive his right to counsel in a capital case.**

Petitioner claims that only counsel may conduct capital guilt and sentencing proceedings and that allowing Petitioner to conduct his own trial and sentencing violated the Sixth, Eighth and Fourteenth Amendments.

While acknowledging the particular dangers of self-representation during the penalty phase of a capital trial, the trial court, on the basis of Faretta, allowed Petitioner to waive counsel and proceed with self-representation.[14]

---

[14] The Arizona Supreme Court was not presented with this aspect of Petitioner's challenge to the trial court's ruling granting the waiver of counsel, so this Court undertakes an independent review.

1    As this Court has discussed <u>supra</u> at p. 12, under AEDPA a petitioner is not entitled

2  to relief unless the state court decision being challenged was an unreasonable application of,

3  or contrary to, clearly established United States Supreme Court law.  <u>Williams (Terry)</u>, 529

4  U.S. at 412.  In <u>Faretta</u>, the clearly established federal law governing this claim, the Supreme

5  Court recognized a right of self-representation in the Sixth Amendment's right to effective

6  assistance of counsel. 422 U.S. 806.  Neither <u>Faretta</u> nor any subsequent ruling by the United

7  States Supreme Court limits the Sixth Amendment right to self-representation to non-capital

8  cases.[15]

9    The trial court's decision to grant Petitioner's motion to waive his right to counsel in

10  a capital case was neither an unreasonable application of nor contrary to Supreme Court law

11  as set forth in <u>Faretta</u>.  Therefore, Petitioner is not entitled to habeas relief on Claim 4.

12  **Claim 5:    The admission of Petitioner's statement to the magistrate at his first
13           appearance, concerning potential imposition of the death penalty, violated
             his rights under *Miranda* and the Fifth Amendment and his Sixth
14           Amendment right to counsel at all critical stages of the proceedings.**

15    At Petitioner's initial appearance before the Lake Havasu City Justice Court on July

16  21, 1987, the magistrate judge appointed an attorney. As the hearing concluded the judge

17  asked Petitioner if he had any questions.  In response to the judge's question Petitioner

18  stated, "If I'm found guilty of this, I want the death penalty." (R.T. 6/27/88 at 8.)

19    Prior to trial, Petitioner moved to suppress his statement, arguing that it was obtained

20  in violation of  <u>Edwards v. Arizona</u>, 451 U.S. 477 (1981).  (R.O.A. 79.)  The court denied

21  the motion, finding that although Petitioner was in custody, he was not being interrogated at

22

23  _____

24    [15] Moreover, circuit courts have rejected the notion that <u>Faretta</u>'s interpretation of the
   Sixth Amendment does not apply to capital cases.  <u>See, e.g.</u>, <u>United States v. Davis</u>, 285 F.3d
25  378, 381 (5th Cir. 2002) (district court's decision to appoint independent counsel for *pro se*
   defendant at the penalty phase of a capital murder case, in order to present mitigating
26  evidence of kind that defendant had specifically declined to present, violated defendant's
   Sixth Amendment right to self-representation); <u>Silagy v. Peters</u>, 905 F.2d 986, 1007-08 (7th
27  Cir. 1990) (holding that the right to self-representation applies in capital sentencing
28  proceedings.)

the time he made the statement, and that his statement was voluntary. (R.T. 6/27/88 at 12-13.) Testimony describing Petitioner's statement was admitted at trial.

The Arizona Supreme Court held that the trial court was correct in ruling that the magistrate judge did not interrogate Petitioner when he asked him if he had any questions. Cook, 170 Ariz. at 56, 821 P.2d at 747. The court explained that, because Petitioner's statement did not result from a custodial interrogation, his rights under Edwards were not violated.[16] Id.

Petitioner argues that the admission of his statement to the magistrate judge violated his Fifth Amendment rights under Miranda v. Arizona, 384 U.S. 436 (1966), and his Sixth Amendment right to have counsel present at all critical stages of the proceedings. This Court disagrees. Analyzed under either the Fifth or the Sixth Amendment, the magistrate judge's inquiry cannot be characterized as an attempt to elicit incriminating information.

In Rhode Island v. Innis, 446 U.S. 291 (1980), the Court explained that

> [T]he Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

Id. at 300-01 (footnotes omitted). The definition of interrogation set forth in Innis "focuses primarily upon the perceptions of the suspect." Id. at 301. However, "since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions that they should have known were reasonably likely to elicit an incriminating response." Id. at 302.

---

[16] In Edwards v. Arizona, the Court held that, "an accused . . . , having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards, 451 U.S. at 484-485; see Michigan v. Jackson, 475 U.S. 625 (1986) (applying the reasoning of Edwards to the Sixth Amendment right to counsel).

Similarly, the Supreme Court has held that "once formal criminal proceedings begin, the Sixth Amendment renders inadmissible in the prosecution's case-in-chief statements 'deliberately elicited' from a defendant without an express waiver of the right to counsel." Michigan v. Harvey, 494 U.S. 344, 348 (1985) (citing Massiah v. United States, 377 U.S. 201, 206 (1964)). According to the "deliberate-elicitation" standard, "the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent"; it "is not violated whenever – by luck or happenstance – the State obtains incriminating statements from the accused after the right to counsel has attached." Maine v. Moulton, 474 U.S. 159, 176 (1985); see Beaty v. Stewart, 303 F.3d 975, 991 (9th Cir. 2002) ("the Sixth Amendment is violated only by deliberate action").

The Court concludes that the magistrate judge did not interrogate Petitioner or deliberately attempt to elicit incriminating information from him when he asked, at the conclusion of Petitioner's initial appearance, whether Petitioner had any questions. Nor was it reasonably foreseeable that Petitioner's answer to that innocuous question, which was "unrelated to the crime or [Petitioner's] participation in it," United States v. Booth, 669 F.2d 1231, 1237 (9th Cir. 1981), would take the form of a non sequitur consisting of Petitioner's request to be sentenced to death if convicted of the charged offenses.

The Arizona Supreme Court's decision affirming the trial court's decision to deny Petitioner's suppression motion and admit the statement was neither contrary to, nor an unreasonable application of, Supreme Court law. Therefore, Petitioner is not entitled to habeas relief on Claim 5.

**Claim 6:      Petitioner was denied his right to due process right to a fair trial under the Fourteenth Amendment because the testimony of John Matzke was coerced by an unconstitutional plea agreement between Matzke and the State.**

Matzke testified at Petitioner's trial. Petitioner did not object. (See R.T. 2/3/95 at 34-35.)

26

On direct appeal Petitioner argued that the Matzke plea agreement, which contained a provision requiring Matzke to provide truthful and consistent information, improperly coerced Matzke's testimony at trial.[17]   The Arizona Supreme Court noted that, "The record in this case is inadequate to permit us to determine as a factual matter whether Matzke's plea agreement was such that his testimony was coerced, thus denying Cook a fair trial." Cook, 170 Ariz. at 58-59, 821 P.2d at 749-50.  The court explained that the issue was more properly addressed in a proceeding for post-conviction relief.  Id.

The PCR court considered and denied this claim, on the grounds that the agreement called on Matzke to provide only truthful statements, which, by definition, would be consistent, thereby nullifying the effect of the consistency provision of the agreement. (R.T. 2/3/95 at 31-32.)  The court also noted that Matzke testified that he had been truthful during his trial testimony. (Id. at 32-33.)

Petitioner claims that "the decisions by the Arizona courts to not preclude Matzke's testimony were contrary to, or an unreasonable application of, clearly established law." (Dkt. 69 at 48.)  However, as Respondents note, Petitioner's merits brief does not cite any federal law or Supreme Court precedent in support of this claim.  In his reply Petitioner urges this Court to view the state court decisions as "an unreasonable refusal to apply the due process

---

[17]  The plea agreement contained the following provision:

John Eugene Matzke will, during such interviews and during such testimony, provide truthful responses to any questions put to him and will not knowingly make any false or misleading statements. The making by John Eugene Matzke of two or more statements during such testimony or interviews which are inconsistent, so that at least one of them must be false, will be considered a violation of this Agreement without the State being required to establish which statement was false.

(Petition for Special Action, October 5, 1995, Ex. 2.)  The agreement also contained a provision requiring Matzke to submit to a polygraph examination and allowing the state to withdraw from the plea if the results of the exam showed that Matzke provided untruthful information.  (Id.)

principle against manipulated evidence to the facts of this case, or an unreasonable refusal to extend the Supreme Court's due process principle against manipulated evidence to 'consistency clause' plea agreements." (Dkt. 85 at 8.)  The cases cited in Petitioner's reply fail to support his expansive interpretation of the Supreme Court's due process jurisprudence.

In Mooney v. Holohan, 294 U.S. 103, 112 (1934), the Court observed that due process is violated where the "state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured."

In Alcorta v. Texas, 355 U.S. 28, 30-31 (1957) (per curiam), the Court found a due process violation where the prosecutor knew that the key witness against a murder defendant had been sexually involved with the defendant's wife but told the witness not to volunteer such information during his testimony.  The Court explained that truthful testimony about the witness's relationship with the defendant's wife would not only have impeached the witness's credibility but would have supported the defendant's theory that he committed the crime in a surge of "sudden passion" upon discovering the witness and his wife kissing in a parked car.  Id. at 31-32.

The due process violation discussed in Miller v Pate, 386 U.S. 1 (1967), was similarly egregious and rendered the defendant's trial unfair.  In Pate prosecution witnesses repeatedly described an exhibit as the defendant's "bloody shorts," and an expert testified that the substance staining the shorts was blood of the same type as the victim's.  386 U.S. at 3-4.  On federal habeas review it was established that the substance on the shorts was paint, and that the prosecutor, who was aware at the time of trial that the stains were not blood, "deliberately misrepresented the truth."  Id. at 6.

Finally, in Giglio v. United States, 405 U.S. 150, 154-55 (1972), the Court held that due process was violated by the state's failure to disclose a lenient plea agreement involving the key witness against the defendant.  At trial the witness testified that he had been offered no promises and the prosecutor argued, incorrectly, that there was no plea deal.  Id. at 151-

52.

These cases stand for the clearly-established proposition that due process is violated by the "deliberate deception of a court and jurors by the presentation of known false evidence," or "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Giglio, 405 U.S. at 153 (internal quotation omitted). Without a showing that Matzke's testimony was deceptive or misleading, these principles cannot reasonably be extended to apply to Petitioner's claim. See Alvarado, 542 U.S. at 666.

There is no support for the proposition that Matzke's testimony was false. In fact, at the evidentiary hearing held during the post-conviction proceedings Matzke testified that his trial testimony had been both truthful and consistent with his earlier statements to the police. (R.T. 12/2/94 at 134.) Moreover, the jury was aware that Matzke had entered into a favorable plea agreement with the state. At trial the prosecutor examined Matzke about the provisions of his plea agreement (R.T. 6/28/88 at 17-18), as did Petitioner, extensively, on cross-examination (see id. at 51-53).

Petitioner has not cited, nor has the Court identified, any Supreme Court authority addressing the due process implications of consistency agreements.[18] Because the specific

---

[18] The federal appellate courts do not appear to have addressed the issue directly, although they have consistently held that, "[a]n agreement that requires a witness to testify truthfully in exchange for a plea is proper so long as 'the jury is informed of the exact nature of the agreement, defense counsel is permitted to cross-examine the accomplice about the agreement, and the jury is instructed to weigh the accomplice's testimony with care.'" Allen v. Woodford, 395 F.3d 979, 995 (9th Cir. 2005) (quoting United States v. Yarbrough, 852 F.2d 1522, 1537 (9th Cir.1988)); see United States v. Moody, 778 F2d 1380, 1384-85 (9th Cir. 1985).

Nor has the Court found any state court authority supporting the proposition that a defendant's due process rights are violated when a witness testifies pursuant to a plea agreement that includes both a consistency clause and a provision requiring truthful testimony. In State v. Rivera, 210 Ariz. 188, 191, 109 P.3d 83, 86 (Ariz. 2005), the court held that the co-defendants' plea agreements, which required truthful testimony and avowals that prior statements were true, were not impermissible "consistency agreements." The court also pointed out that the "record was devoid" of any evidence that the co-defendants testified untruthfully and that the state presented false testimony. 210 Ariz. at 192-93, 83 P.2d at 87-

29

issue raised by this claim is not the subject of established Supreme Court precedence, and because this claim was addressed on the merits in state court, Petitioner is precluded from relief under AEDPA. See Williams, 529 U.S. at 381; cf. Kane v. Garcia Espitia, 126 S. Ct. 407 (2005) (per curiam) (finding no basis for federal habeas relief where asserted right not established by existing Supreme Court caselaw).

Petitioner is not entitled to federal habeas relief on Claim 6.

**Claim 8:    The prosecutor's personal investigation of a juror, and the juror's subsequent disqualification, violated Petitioner's Sixth and Fourteenth Amendment right to a trial by jury.**

During a recess in the defense's presentation of its case, the state moved to dismiss one of the jurors. The prosecutor informed the court that he had learned that the juror had been discussing the case with her co-workers. (R.T. 7/5/88 at 7.) The prosecutor also indicated that the juror, having learned that the prosecutor had contacted some of her co-workers during his investigation of the incident, had attempted to contact him, and that he had declined to speak with her. (Id.)

The trial judge held a hearing at which he interviewed the juror in the presence of the prosecutor and Petitioner. The juror admitted that she had made comments about the trial and had responded to co-workers' comments (such as, "Did you hang him yet?") and to their questions about the content of the photographic evidence, but denied discussing trial testimony. (Id.) She also indicated that she had told her co-workers that she "didn't think it was a well-organized trial and . . . some of the witnesses looked – well, made themselves look as if [they] didn't know what they were talking about." (Id.) She stated, however, that she had formed no opinion as to Petitioner's guilt or innocence, and denied making any comments indicating that she had formed an opinion. (Id.) Finally, the juror indicated that she would not mind being disqualified, "because I don't care for my co-workers to be harassed on the job." (Id. at 11.)

_____

88.

The prosecutor requested that the juror be excused based upon her violation of the court's admonition not to discuss the case and on what he characterized as her "inhospitable attitude toward counsel for the state," which was revealed in her comments about her colleagues being harassed at work. (Id. at 14.)

Although Petitioner argued that the juror should not be dismissed because there was no evidence to support the prosecutor's assertions, the judge granted the prosecution's motion, finding that, "even though at least as far as her description of it, it perhaps sounds innocuous, it is very clear to me that she has not obeyed my order to the jurors which I have repeated I would think at least ten or fifteen times now." (Id. at 16.)

The Arizona Supreme Court, while criticizing the prosecutor's actions in initiating an investigation without first informing the court, held that the trial court did not abuse its discretion in dismissing the juror for cause pursuant to Rule 18.4(b) of the Arizona Rules of Criminal Procedure. Cook, 170 Ariz. at 54-55, 821 P.2d at 745-46. The court explained that

> it was reasonable for the trial judge to determine that the juror's ability to render a fair and impartial verdict had become suspect. She admitted to the judge that she had commented on the trial with her co-workers despite the judge's clear admonitions not to discuss the case with outsiders. We recognize that some discussion by jurors of their pending cases may be inevitable. Nevertheless, the trial court had evidence of specific violations of its admonitions to the jurors. These violations went beyond casual utterances regarding, for example, the length of the trial or similar matters, but instead concerned the conduct of witnesses and the content of specific exhibits. The court did not abuse its discretion in determining that there was cause to strike the juror for violation of its admonition.

Id. at 54, 821 P.2d at 745 (citation omitted).

To support his argument that removal of the juror violated his right to a fair trial, Petitioner relies on Remmer v. United States, 347 U.S. 227 (1954). Petitioner asserts that under Remmer the trial court erred in not finding that Petitioner was prejudiced by the removal of a juror who had expressed negative views about the merits of the state's case. The Court disagrees that the holding in Remmer supports Petitioner's position.

In Remmer the defendant was convicted of tax evasion. After the verdict he learned that during the trial an unidentified individual had approached one of the jurors, who

subsequently became the jury foreperson, and told him that he could profit by bringing in a verdict favorable to the defendant. Id. at 228. The juror had reported the contact to the trial judge, who in turn informed the prosecutors. Id. After discussions between the judge and the prosecutors, the FBI was called in to investigate. Id. The FBI report, which was considered by the judge and the prosecutors alone, concluded that the remark to the juror was made in jest, and no further action was taken. Id. The defendant was never informed, and only learned of the investigation through newspaper reports. Id.

The district court denied the defendant's motion for a new trial, and the Ninth Circuit affirmed. Id. The Supreme Court then vacated the conviction and remanded the case to the district court for a hearing to determine whether the defendant had suffered prejudice resulting from the juror's contact with an outsider and the subsequent investigation. Id. at 229. The Court explained that any "private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is . . . deemed presumptively prejudicial." Id. The Court then outlined the procedure the court should have followed upon receiving information from the juror, stating that, "The trial court should not decide and take final *ex parte* action on information such as was received in this case, but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." Id.

The Court's ruling in Remmer was premised on a number of factors that are not present in this case. First, no one tampered with or even contacted the juror; instead, it was the juror's own activities that prompted the concern of the state and the trial court. Next, the trial court held a hearing in which the parties participated and the juror was questioned. Finally, the juror was dismissed prior to deliberations and did not participate in the verdict.

In addition to Remmer Petitioner relies upon United States v. Brown, 823 F.2d 591 (D.C. Cir. 1987), and United States v. Symington, 195 F.3d 1080 (9th Cir. 1999), cases which stand for the proposition that "a court may not dismiss a juror *during deliberations* if the request for discharge stems from doubts the juror harbors about the sufficiency of the

evidence." Symington, 195 F.3d at 1085 (quoting Brown, 823 F.2d at 596) (emphasis added). Again, the Court does not find these cases apposite. First, the juror in Petitioner's trial was not dismissed during deliberations; therefore her true opinion regarding the sufficiency of the evidence, in contrast to that of the jurors in Brown and Symington, was not known. In addition, the prosecutor's request that the juror be excused was not based upon her views of the sufficiency of the evidence. Instead, as noted above, the prosecutor cited as grounds for dismissing the juror her disobedience of the court's admonitions and the antipathy she evidenced toward the prosecutor when questioned by the court. Furthermore, the court clearly indicated that its reason for excusing the juror was her violation of the court's repeated admonition not to discuss the case with outsiders; the court did not cite as grounds for its order either the juror's opinion of the evidence or her attitude toward the prosecutor. Finally, the issue was presented on direct appeal in Brown and Symington; as the Symington court noted, citing Perez v. Marshall, 119 F.3d 1422 (9th Cir. 1997), a case involving a similar issue, "The difference in procedural posture between direct federal review and habeas-based review makes *Perez* inapposite to this case." Symington, 195 F.3d at 1086 n.3.

In Perez the petitioner sought habeas relief on the grounds that the trial court's removal of the sole dissenting juror violated his Sixth Amendment right to an impartial jury. Id. at 1423. The state trial court had determined that the juror was too emotionally unstable to continue deliberating and dismissed her for good cause. Id. The district court denied the habeas petition and the Ninth Circuit affirmed. Id. The court noted that on habeas review the state court's factual determinations were entitled to a presumption of correctness. Id. at 1426 (citing Rushen v. Spain, 464 U.S. 114, 120 (1983) (per curiam)). The court also explained that, "a trial court's findings regarding juror fitness are entitled to special deference." Id. (citing Patton v. Yount, 467 U.S. 1025, 1036-38 & n.12 (1984)). On appeal, the Ninth Circuit held that the record supported a finding that the state trial court's decision to dismiss the juror was not based upon the fact she was the lone holdout against eleven votes

for conviction; rather, the judge had been "forced to act" because the juror's emotional instability prevented her from fulfilling her duties as a juror.[19] Id. at 1427. In the present case the record is clear that the trial court excused the juror because she had violated the court's repeated admonition not to discuss the case with outsiders.  The trial court's decision is entitled to a presumption of correctness.  28 U.S.C. § 2254(e)(1).  Petitioner has not overcome that presumption with clear and convincing evidence.  Id.

Moreover, assuming that the trial court erred in its factual determinations regarding the fitness of the disqualified juror, Petitioner has failed to show that the court's actions in dismissing the juror amounted to a constitutional violation.  The Supreme Court has clearly established that a defendant is entitled to a jury composed of "*jurors* who will conscientiously apply the law and find facts." Lockhart v. McCree, 476 U.S. 162, 178 (1986) (quoting Wainwwright v. Witt, 469 U.S. 412, 423 (1985) (emphasis in McCree); see Smith v. Phillips, 455 U.S. 209, 217 (1982) ("Due process means a jury capable and willing to decide the case solely on the evidence before it").  Petitioner has not cited, nor has this Court located, any authority holding that these constitutional principles are violated when a trial court excuses a juror for disobeying its admonitions or instructions.  See Young v. Duncan, 135 Fed.Appx. 75, 77 (9th Cir. 2005) (trial court did not violate the defendant's

---

[19] The holding in Perez may be distinguished from that of Sanders v. Lamarque, 357 F.3d 943 (9th Cir. 2004).  In Sanders the trial court dismissed a juror for implied bias when it received information, during deliberations, that the juror, who was the lone holdout against a guilty verdict, may have provided misleading information during voir dire.  Id. at 945-47. The Ninth Circuit held that the state trial court and the California Court of Appeal reached "an unreasonable determination of the facts" under § 2254(d)(2) by finding that the juror had deliberately withheld important information and was impermissibly biased.  Id. at 948.  The Ninth Circuit based its ruling on its reading of the record which, the court felt, clearly indicated that the juror's answers to questions during voir dire were not misleading but technically accurate.  Id.  The court also noted the "highly significant" fact that the trial court had initially found that the juror was not biased and reversed its position only after argument by the prosecution that it would have challenged the juror if it had been aware of the disputed information at voir dire.  Id. at 949-50.  In Perez, by contrast, the Ninth Circuit found that the record did not contain clear and convincing evidence calling into question the trial court's decision to dismiss the emotionally distraught juror.

1  right to an impartial jury by dismissing a juror who violated the court's instructions during
2  deliberations).   As the Sixth Circuit has explained, a defendant "does not have a
3  constitutional right to have a particular person sit as a juror." McQueen v. Scroggy, 99 F.3d
4  1302, 1327 (6th Cir. 1996), reversed on other grounds, In re Abdur'Rahman, 392 F.3d 174
5  (6th Cir. 2004). In McQueen the state trial court dismissed a juror for violating the court's
6  admonition not to discuss the case. Id. The district court denied the habeas petition and the
7  Sixth Circuit affirmed. Id. In its ruling the circuit court noted that the petitioner was "unable
8  to offer a single case that holds that it is a violation of the United States Constitution for a
9  state court trial judge to demand adherence to the letter of the law in a jury sitting in a capital
10 case." Id. at 1328.   The court further concluded that, even if the juror had been wrongly
11 dismissed, the petitioner did not suffer prejudice, because "all of the remaining thirteen jurors
12 were equally qualified to serve on the panel." Id.

13       The Arizona Supreme Court determined that the trial court did not violate Petitioner's
14 right to a fair trial by an impartial jury when it dismissed a juror for violating the court's
15 admonition not to discuss the case.   That decision was neither contrary to, nor an
16 unreasonable application of, Supreme Court law.   Therefore, Petitioner is not entitled to
17 habeas relief on Claim 8.

18 **Claim 9:      The trial court's refusal to instruct the jury on second-degree murder as**
19 **               a lesser-included offense of capital murder violated Petitioner's Eighth**
20 **               and Fourteenth Amendment rights to due process and a fair and reliable**
**               trial under *Beck v. Alabama*.**

21       In Beck v. Alabama, 447 U.S. 625, 627 (1980), the Supreme Court held that the death
22 penalty may not be imposed if the jury that convicted the defendant of a capital crime was
23 not permitted to consider a lesser-included non-capital offense. However, due process
24 requires that a lesser-included offense instruction be given only when the evidence warrants
25 the instruction. Id.; see Hooper v. Evans, 456 U.S. 605, 611 (1982); Clabourne v. Lewis, 64
26 F.3d 1373, 1380 (9th Cir. 1995) (noting that it is plain error for the court to fail to give a
27 lesser included instruction on second-degree murder in a capital case "where the evidence

28

would permit a jury rationally to find [the defendant] guilty of the lesser offense and acquit him of the greater offense").

At sentencing the trial court indicated that it would only provide instructions on first-degree murder. (R.T. 7/6/88 at 46-47.) Petitioner sought an instruction for second-degree murder. (Id. at 47.) The court agreed with the State's argument that there was no evidentiary basis upon which a jury could find Petitioner committed the murders without premeditation. (Id. at 49-50.) The Arizona Supreme Court upheld the trial court's decision not to provide an instruction for second-degree murder:

> In this case, the trial court refused Cook's proposed instruction on second degree murder because the court did not see "any basis upon which the jury could feel that the Defendant committed these murders without premeditation." Matzke's testimony at trial indicated that he and Cook had discussed killing Cruz Ramos and had decided to kill him at least thirty minutes before they actually committed the murder. In addition, Cruz Ramos died from strangulation, and Matzke's testimony further indicated that, because of several unsuccessful attempts, fifteen minutes passed between the time that the attempt to murder Cruz Ramos began and the time that Cruz Ramos appeared to die. Swaney also died from strangulation. Matzke testified that he and Cook tried to strangle Swaney with a sheet, and when they failed Cook said "this one's mine" and proceeded to kill Swaney. There was no evidence that these murders were committed in the heat of passion or as the result of a quarrel. *See* A.R.S. § 13-1101(1). The record supports the trial court's finding that there was no basis for a jury to find that the murders were committed without premeditation, and we will not disturb that finding.

Cook, 170 Ariz. at 59, 821 P.2d at 750.

Pursuant to A.R.S. § 13-1105(A)(1), "A person commits first-degree if: Intending or knowing that the person's conduct will cause death, the person causes the death of another person . . . with premeditation." Only the element of premeditation distinguishes first-degree murder from the lesser-included offense of second-degree murder. Clabourne, 64 F.3d at 1380. A defendant kills with premeditation if he "acts with either the intention or the knowledge that he will kill another human being, when such intention or knowledge precedes the killing by a length of time to permit reflection. An act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion." A.R.S. § 13-1101(1). A period of reflection of "any length of time" after forming the intent to kill is

36

sufficient to show premeditation. Clabourne, 64 F.3d at 1380. Circumstantial evidence that may prove premeditation includes "threats made by the defendant to the victim, a pattern of escalating violence between the defendant and the victim, or the acquisition of a weapon by the defendant before the killing." State v. Thompson, 204 Ariz. 471, 479, 65 P.3d 420, 428 (Ariz. 2003).

At trial no evidence was presented that would have allowed a jury rationally to convict Petitioner of second-degree murder while acquitting him of first-degree murder. As the trial court and Arizona Supreme Court noted, given the evidence presented at trial it would not have been possible for a rational jury to find that Petitioner committed the murders but did so without premeditation, with his actions being the "instant effect of a sudden quarrel or heat of passion." See Clabourne, 64 F.3d at 1381 (despite defendant's claim that he was intoxicated during the several hours during which the victim was assaulted by defendant and two accomplices before being killed, the "evidence that [he] acted with premeditation [was] overwhelming," so that the trial court did not err in refusing to instruct on second-degree murder); Carriger v. Lewis, 971 F.2d 329, 335-336 (9th Cir. 1992) (defendant not entitled to second-degree murder instruction where the "murder method" – the victim having been tied up, beaten with a skillet, and strangled to death with a necktie – prevented defendant from establishing a "lesser intent").

Petitioner argues that the only evidence of premeditation was that contained in Matzke's testimony and that, if the jury disbelieved that testimony, it could have found Petitioner guilty only of second-degree murder. The Court disagrees. Premeditation was established not merely by Matzke's testimony but by the circumstances surrounding the murders, including the manner in which Cruz Ramos and Swaney were ultimately killed. Given such evidence a jury could rationally have found only that Petitioner did not commit the murders, not that the murders were committed without premeditation.

The Arizona Supreme Court's decision upholding the trial court's refusal to provide a second-degree murder instruction was neither contrary to, nor an unreasonable application

of, Supreme Court law. Therefore, Petitioner is not entitled to habeas relief on Claim 9.

**Claim 10:**     **The prosecutor's comments during closing argument, including allusions to Petitioner's failure to explain where he was at the time of the murders and the fact that Petitioner was the only person in the courtroom who could explain what had happened, violated Petitioner's Fifth and Fourteenth Amendment right to remain silent and not testify on his own behalf.**

Petitioner claims that during closing argument the prosecutor impermissibly drew the jury's attention to Petitioner's invocation of his Fifth Amendment privilege not to testify in his defense.

The Fifth Amendment prohibits a prosecutor from commenting to the jury about a defendant's failure to testify at trial. Griffin v. California, 380 U.S. 609, 615 (1965). "Griffin prohibits the judge and prosecutor from suggesting to the jury that it may treat the defendant's silence as substantive evidence of guilt." United States v. Robinson, 485 U.S. 25, 32 (1988) (quoting Baxter v. Palmigiano, 425 U.S. 308, 319 (1976)). As the Ninth Circuit has explained, a prosecutorial comment violates this rule "if it is manifestly intended to call attention to the defendant's failure to testify, or is of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify." Lincoln v. Sunn, 807 F.2d 805, 809 (9th Cir. 1987).

Relief is to be granted on a Griffin claim only "where such comment is extensive, where an inference of guilt from silence is stressed to the jury as a basis for the conviction, and where there is evidence that could have supported acquittal." Lincoln, 807 F.2d at 809 (quoting United States v. Kennedy, 714 F.2d 968, 976 (9th Cir. 1983)); see Jeffries v. Blodgett, 5 F.3d 1180, 1192 (9th Cir. 1993). Moreover, as the Robinson Court explained, "The broad dicta in Griffin to the effect that the Fifth Amendment forbids . . . comment by the prosecution on the accused's silence, must be taken in light of the facts of that case." Id. at 33-34. Finally, an improper comment merits habeas relief only if it results in actual prejudice. Jeffries at 1190 (citing Brecht v. Abrahamson, 507 U.S. 619, 627 (1993)).

The first comments Petitioner challenges consist of the prosecutor's reference to an

inmate named Terry Holt.  At trial Holt testified on Petitioner's behalf, indicating that Matzke had told him that he alone was responsible for the killings.  Holt also served as Petitioner's legal adviser and, according to Petitioner, he and Holt had been in frequent contact while incarcerated.  During his closing argument the prosecutor attacked Holt's credibility and questioned whether the conversations between Holt and Matzke ever occurred.  The prosecutor concluded his attack on the testimony provided by Holt, whom he characterized as Petitioner's "star witness" (R.T. 7/6/88 at 78), with the following comments about the alleged conversations between Holt and Petitioner:

> They have these long conversations.  They talk everyday.  Never once was Terry Holt told by this man where he was.  Never once does Dan Cook . . . say I wasn't there because I was at McDonalds in Kingman or out of state or somewhere.  Why was he never told where Dan Cook was?

(Id. at 78.)  Petitioner did not object to the comments.[20]

The Arizona Supreme Court held that these comments did not violate Griffin because, "[c]onsidered in the appropriate context, the prosecutor's comment regarding Petitioner's conversations with Terry Holt was not a comment on Petitioner's failure to testify or his invocation of his right to remain silent." Cook, 170 Ariz. at 51, 821 P.2d at 742.  Instead, noting that Petitioner had listed alibi as one of his defenses, the court explained that "the prosecutor's statement implies that if Petitioner had an alibi, he would have mentioned it in his allegedly frequent conversations with Holt." Id.; cf. United States v. Fleishman, 684 F.2d 1329, 1343 (9th Cir. 1982) ("[a] prosecutor may properly comment upon a defendant's failure to present witnesses so long as it is not phrased as to call attention to defendant's own failure to testify").

This Court agrees that "the prosecutor's comment was not directed at the fact that [Petitioner] did not testify." Id.  In fact, the comment referred to information provided by Holt's testimony, and the lack of any reference therein to an alibi for Petitioner.  The

---

[20]  The Court employs the plain error standard to review prosecutorial comments to which a defendant failed to object. Jeffries, 5 F.3d at 1191.

comment did not, therefore, as the Arizona Supreme Court correctly observed, "insinuate that [Petitioner] failed to provide an alibi because he had not testified." Id.

Petitioner next objects to comments the prosecutor made using Petitioner's tattoo as a rhetorical device to support Matzke's credibility:

> John Matzke doesn't have anything to hide. This man does.
>
> How do we know that? Remember voir dire when we were selecting everybody? His left forearm has the tattoo of a dagger on it. He has covered that tattoo from the first day of the trial until today. He has had a large band-aid over that dagger. He covered that up. I suppose he didn't want you to think that he does have violent tendencies. If you saw that dagger on his forearm you could suppose that he did have such so he covered it up.
>
> We wonder what else he covered up. But we don't have to wonder long. We don't have to wonder hard because he's done a poor job of covering everything else up.

(RT 7/6/88 at 79.) Again, Petitioner did not object.

This Court agrees with the conclusion of the Arizona Supreme Court that, "[t]here is nothing to suggest that these comments referred to the fact that Petitioner did not testify or that they were calculated to draw the jury's attention to that fact." Cook, 170 Ariz. at 51, 821 P.2d at 742. The comment occurred in the context of the prosecutor's response to Petitioner's attack on Matzke's trurhfulness. The prosecutor used the band-aid with which Petitioner concealed his tattoo as a figurative device to suggest a contrast with Matzke's openness on the witness stand. Given this context and the comment's exceptionally oblique relationship to the issue of Petitioner's exercise of his Fifth Amendment rights, the Court concludes that the comment was neither "manifestly intended to call attention to the defendant's failure to testify, or . . . of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify. Lincoln, 807 F.2d at 809.

Petitioner next challenges comments the prosecutor offered which referred to the fact that Petitioner, unlike Matzke, did not make a videotaped statement upon his arrest, a subject which arose during the trial when Petitioner sought to discredit testimony regarding his statement to the police. While cross-examining Detective Eaton, Petitioner attempted

to cast doubt on his inculpatory statement by asking why other witnesses' statements were recorded but his was not:

> Q.    Sir, is it true that everybody else that was interviewed by you was recorded in some way other than myself?
>
> A.    We recorded Mr. Matzke. At the conclusion of my interview with you, you requested not to be recorded because you didn't want to make a statement. We had the tape playing so we recorded Mr. Watkins.
>
> Q.    But you didn't record me; is that correct?
>
> A.    That's correct. You invoked your right to remain silent and I terminated the interview.

(R.T. 6/30/88 at 120.)

Petitioner immediately objected, and later moved for a mistrial on the grounds that Detective Eaton had referred to Petitioner's invocation of his right to remain silent. (Id. at 126.)  The court denied the request on the grounds of "invited error," stating that the testimony was in response to the line of questioning that Petitioner himself had initiated and had been pursuing for over twenty minutes. (Id. at 127-28.)

During his closing argument the prosecutor made reference to Eaton's testimony:

> And what about the videotape.  John Matzke made one and we heard continuous cross-examination of the detective about why the Defendant didn't make one. He didn't make one because he, the Defendant, was the one that cut off the interview.  If he had made one, you would have had the statements we got to partying a little bit and things got out of hand.  My roommate killed one and I killed the other.  I killed Kevin.  You would have heard the exact same statements.

(R.T. 7/6/88 at 84.)

Petitioner objected to this comment and again moved for a mistrial. (Id. at 97.) The court denied his motion, explaining that once the testimony came in, the prosecutor was justified in referring to it in his argument. (Id.)  The Arizona Supreme Court "agree[d] with the trial court that any error occasioned by Detective Eaton and the prosecutor's comments was invited by Petitioner's strategy in questioning why his interview had not been taped." Cook, 170 Ariz. at 52, 821 P.2d at 743.

41

The Court agrees. The prosecutor's comments were a "fair response," <u>Robinson</u>, 485 U.S. at 32, to Petitioner's strategy of challenging the veracity of Detective Eaton's testimony regarding the contents of his interview with Respondent. In addition, because the fact that Petitioner terminated his interview with the detective was properly before the jury, having been elicited by Petitioner's own cross-examination of Detective Eaton, the prosecutor was entitled to comment on it in his closing argument. Furthermore, as the Arizona Supreme Court noted, the prosecutor's comments were "pertinent" to Petitioner's attack on Detective Eaton's credibility. <u>Cook</u>, 170 Ariz. at 52, 821 P.2d at 743.

The final comments Petitioner challenges also occurred while the prosecutor was defending Matzke's testimony as honest and forthright against Petitioner's argument that Matzke was a liar:

> When he says Matzke is a liar, he is not. No man would underrated [sic] himself to the degree that he did not just with the murders but his lifestyle. He's not a liar. He was there. He is one of the remaining people who are alive who were there. The other one sits at that table.
>
> . . . .
>
> There were only four people there at that [sic] time of the deaths; two of them are dead; one is in prison; one is the Defendant.

(R.T. 7/6/88 at 83-84.) Petitioner did not object to these comments at trial. (<u>Id.</u>)

The Arizona Supreme Court did not specifically address these comments, so this Court performs an independent review of the record to ascertain whether the state court decision was objectively unreasonable under controlling federal law. <u>Himes</u>, 336 F.3d at 853. The Court concludes that, taken as whole and viewed in their context as a response to Petitioner's attack on Matzke's credibility, the prosecutor's comments were not of such a character that the jury would naturally and necessarily take them to be a comment on Petitioner's failure to testify. In making this determination the Court contrasts these comments with those made in <u>Lincoln</u>, where the prosecutor repeatedly emphasized that the defendant was the only person who could have rebutted the evidence against him and did so using phrases such as "there's only one person who can tell us" and "there is only one

other person who can testify." <u>Lincoln</u>, 807 F.2d at 809 n.1.  Such references to the defendant's failure to testify are far more explicit than anything offered by the prosecutor at Petitioner's trial.

Applying the three-part <u>Jeffries</u> test to the totality of the challenged comments, the Court finds that the prosecutor's statements were isolated rather than extensive; did not stress Petitioner's silence as a basis for the conviction but rebutted arguments Petitioner himself raised; and there was substantial evidence supporting Petitioner's guilt, which the prosecutor emphasized in his closing arguments.  <u>See</u> 114 F.3d at 1192.  Moreover, the Court finds that the prosecutor's comments, even if they violated Petitioner's Fifth Amendment rights under <u>Griffin</u>, constituted harmless error pursuant to <u>Brecht</u>.  Given the strength of the evidence against Petitioner, the prosecutor's comments did not have a "substantial and injurious effect on the jury's verdict." <u>Brecht</u>, 507 U.S. at 627 (quotation omitted).

The decision of the Arizona Supreme Court rejecting Petitioner's challenge to the prosecutor's comments during closing arguments was neither contrary to, nor an unreasonable application of, clearly established federal law.  Therefore, Petitioner is not entitled to habeas relief on Claim 10.

**Claim 14:** **The trial court's failure to receive evidence of intoxication during the sentencing phase of his trial was a violation of Petitioner's Eighth and Fourteenth Amendment right to have the court consider evidence of a highly relevant mitigating factor.**

Petitioner argues that under the facts of his case, where he was allowed to waive counsel and the court prohibited evidence of his intoxication at the time of the crime, the failure of the trial court to receive voluntary intoxication evidence violated his right to have such evidence considered by the sentencing court.  Petitioner argues that the trial court's order precluding the introduction of intoxication evidence was not limited to the guilt phase of the trial and therefore he was misled into believing that he could not offer such evidence in mitigation at his pre-sentence hearing.

Respondents counter that Petitioner was not precluded from offering such evidence as mitigation and the fact that he failed to do so does not present a colorable constitutional claim. Citing <u>Faretta</u>, Respondents argue that if Petitioner's failure to offer evidence of intoxication as a mitigating circumstance was based upon a misunderstanding of the law or of the trial court's ruling, Petitioner may not claim such a failure as grounds for relief. <u>See</u> <u>Faretta</u>, 422 U.S. at 834 n.46 (a *pro se* defendant may not allege ineffective assistance of counsel as a ground for appeal).

As noted above, after the State elected to proceed under the knowing rather than intentional theory of premeditation the trial court granted the state's motion to preclude evidence of intoxication. (R.T. 6/24/88 at 15-18.) Petitioner stated that he had no objection to the motion, and that it "basically does not even apply to my defense." (<u>Id.</u> at 16.)

On direct appeal the Arizona Supreme Court noted that "the trial judge's order precluding evidence of intoxication at trial applied only to the trial and in no way precluded Cook from introducing evidence of intoxication to establish a mitigating factor at sentencing," <u>Cook</u>, 170 Ariz. at 50, 821 P.2d at 741, and that "there is nothing in the record to indicate that Cook was misled to believe otherwise." <u>Id.</u> at 63, P.2d at 754. The court further explained that the fact that Petitioner, as a consequence of his self-representation, did not "fully understand" that he could offer such evidence in mitigation "is not grounds for relief." <u>Id.</u>

Supreme Court jurisprudence has established that in a capital case the sentencer must be allowed to consider in mitigation "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." <u>Lockett v. Ohio</u>, 438 U.S. 586, 604 (1978); <u>see</u> <u>Eddings v. Oklahoma</u>, 455 U.S. 104, 114-15 (1982).

Among the mitigating circumstances set forth in Arizona's death penalty statute is the "insufficient capacity" factor: "The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly

impaired, but not so impaired as to constitute a defense to prosecution." A.R.S. § 13-703(G)(1). When the trial court sentenced Petitioner, it considered information regarding Petitioner's intoxication at the time of the murders:

> I perhaps have a little difficulty with this mitigating factor. There has been at least the suggestion during the trial in this case that at the very least the Defendant was consuming alcoholic beverages during the course of these crimes. There was also the suggestion that some sort of drug – methamphetamine I believe – may have been taken at some time prior to these offenses.
>
> I do not believe that there has been anything presented to me that would justify me in finding that the Defendant was under the influence of alcohol or drugs at the time of the murders to the extent that it would have affected his ability to appreciate the wrongfulness of his conduct or to conform his conduct and I simply do not find that this mitigating factor has been shown in this case.

(R.T. 8/8/88 at 16.)

Furthermore, as the Arizona Supreme Court noted, evidence of Petitioner's impairment was before the trial court in the form of the Rule 11 reports prepared by Drs. Wynkoop and Almer. Cook, 170 Ariz. at 64, 821 P.2d at 755. (See R.T. 8/8/88 at 8.) Each of the reports presents Petitioner's version of the events surrounding the murders, including his description, in Dr. Wynkoop's report, of "psychoactive substance abusing behaviors during the day prior to and the evening of the alleged crimes which involved the taking of amphetamines, smoking of marijuana and drinking a large amount of beer." (R.O.A. 27e.) With regard to this substance abuse, Dr. Wynkoop stated that, "If [Petitioner's] statements were correct, it implied severe toxicity with major impairment of reasoning and actions." (Id.) Dr. Wynkoop concluded that at the time of the murders Petitioner "was apparently so toxic as to impact on his ability to exercise judgment." (R.O.A. 27g.) Dr. Almer's report also details Petitioner's account of his extensive drug and alcohol abuse during the period when the murders occurred, including the daily ingestion of 40 milligrams of valium, one-eighth gram of amphetamines, 24 beers, and three or four marijuana cigarettes.[21] (R.O.A.

---

[21]    These figures are comparable to those Petitioner claims he would have presented had he chosen to proffer mitigation evidence. Petitioner contends that "the trial

33d.)  Based upon this information Dr. Almer concluded that Petitioner was "seriously impaired" at the time of the murders.  (R.O.A. 33l.)

Because the trial court reviewed the entire record, including the Rule 11 reports, prior to making its sentencing decision, Petitioner is incorrect that the court did not consider in mitigation information regarding his state of intoxication at the time of the crimes.  As the Arizona Supreme Court also explained, however, the Rule 11 experts' "assessments of Cook's intoxication and its possible effects were based . . . on Cook's own statements, and the trial court was free to doubt the veracity of those statements." Cook, 170 Ariz. at 64, 821 P.2d at 755.  Despite Petitioner's failure to proffer such evidence, the trial court did consider Petitioner's claim that he was highly intoxicated at the time the crimes were committed. Therefore, Petitioner was not prejudiced by his failure to present such evidence at the presentence hearing.

Because Petitioner was not precluded from presenting intoxication as a mitigating factor at sentencing, and because the trial court did consider evidence of intoxication in its sentencing decision, the holding of the Arizona Supreme Court was neither contrary to, nor an unreasonable application of, Supreme Court law as set forth in Lockett and Eddings. Petitioner is not entitled to habeas relief on Claim 14.

**Claim 15:    The Arizona death penalty statute imposes procedures that violate Petitioner's Eighth and Fourteenth amendment right to be free from cruel and unusual punishment.**

In his amended petition Petitioner argued that the Arizona death penalty statute imposes procedures that violate his right to be free from cruel and unusual punishment because a judge rather than a jury imposes the death sentence, because there is a presumption in favor of a death sentence, and based on the statutory allocation of the burden of proof for aggravating and mitigating circumstances.  (Dkt. 18 at 50.)  In his merits brief Petitioner

---

court would have been informed that Dan Cook drank approximately fifty (50) beers during the night and morning of the murders and shared approximately 6-8 marijuana joints with John Matzke."  (Dkt. 69 at 63.)

1
2
3

"recognize[d]" the effect of the ruling in <u>Walton v. Arizona</u>, 497 U.S. 639 (1990), which upheld the constitutional validity of Arizona's capital sentencing scheme, but indicated that he did not waive the claim but preserved it for review.  (Dkt. 69 at 66.)

4
5
6
7
8
9

<u>Ring v. Arizona</u>, 536 U.S. 584, 609 (2002), overruled <u>Walton</u>, invalidating the judge-only provision of Arizona's sentencing scheme.   However, because direct review of Petitioner's conviction and sentence was final prior to the decision in <u>Ring</u>, Petitioner is not entitled to relief premised on that ruling.  <u>See</u> <u>Summerlin v. Schriro</u>, 124 S. Ct. 2519 (2004) (holding that <u>Ring</u> does not apply retroactively to cases on collateral review); <u>State v. Towery</u>, 204 Ariz. 386, 64 P.3d 828 (2003) (same).

10
11
12
13

Because <u>Ring</u>'s holding with respect to judge-only sentencing does not apply retroactively, and because <u>Ring</u> did not alter <u>Walton</u>'s ruling with respect to the validity of the remainder of Arizona's capital sentencing statute, Petitioner is not entitled to relief on Claim 15.

14
15

**Claim 16:    Petitioner's death sentence violates the Eighth and Fourteenth Amendments because the court failed to consider Petitioner's history of mental problems.**

16
17
18
19
20
21
22
23

Petitioner contends that his death sentence violates the Eighth and Fourteenth Amendments because at sentencing the trial court failed to consider and give effect to his background of neurological trauma, mental dysfunction, and suicide attempts.  Specifically, Petitioner argues that in considering his mental problems in mitigation the trial court impermissibly focused on the issue of whether Petitioner's mental condition was causally related to the crimes and failed to consider the cumulative weight of the mitigation evidence. Respondents contend that in passing sentence the trial court adequately and properly considered evidence of Petitioner's mental health issues.  The Court agrees.

24
25
26
27
28

As noted above, in a capital case the sentencer must have the opportunity to consider in mitigation "any aspect of a defendant's character or record." <u>Lockett</u>, 438 U.S. at 604; <u>see</u> <u>Eddings</u>, 455 U.S. at 113-114 ("[j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a

matter of law, any relevant mitigating evidence"). However, while the sentencer must not be foreclosed from considering relevant mitigation information, "it is free to assess how much weight to assign to such evidence." Ortiz v. Stewart, 149 F.3d 923, 943 (9th Cir. 1998); see Eddings, 455 at 114-15 ("The sentencer . . . may determine the weight to be given relevant mitigating evidence").

As noted above, Petitioner did not proffer any mitigating evidence at the sentencing hearing. Respondents are correct, however, that at sentencing the trial court nevertheless considered Petitioner's history of mental problems.[22] This information, including reports of previous suicide attempts, head trauma, and substance abuse, was contained in the Rule 11 examinations and the presentence report.

In making its sentencing determination the trial court accurately explained its obligations under A.R.S. § 13-703(G), stating that, "As far as mitigating factors are concerned, the statute requires me to specifically consider some of these that are set forth and to also consider any other aspect of the Defendant's character, propensities or record and any of the particular circumstances of the offense." (R.T. 8/8/88 at 15-16.) The court then set forth its reasoning with respect to the enumerated statutory factors, including the "insufficient capacity" factor forth in 703(G)(1). It was in the context of 703(G)(1) that the court explained that it did not find that Petitioner's intoxication constituted a mitigating factor. (Id. at 16.)

After concluding its analysis of each statutory mitigating factor, the court continued its discussion, indicating that, "I have also considered anything else about the Defendant which has been brought to my attention in any way and even though they have not been specifically argued by the Defendant, I still feel that I have an obligation to acknowledge on the record that I have considered them." (Id. at 18.)

---

[22]   The trial court explained that, "even though you have not argued any possible mitigating circumstances, I still feel that I have an obligation to consider whether there are any in this case and what weight to attach to them." (R.T. 8/8/88 at 10.)

48

The trial court then addressed Petitioner's mental health history:

> I have also considered – and I believe that this is something that the record almost jumps out and requires me to consider – I have considered the prior history of mental problems that the Defendant has had and I believe that the Rule 11 examination reports and also the presentence reports have pretty well charted the contacts that the Defendant has had with various mental health facilities. They have also charted the at least previous attempts that he made in the past to take his own life. I simply do not find there to be any connection between any of these prior mental problems and the offenses that were committed in this case.

> I have considered this issue at great length in the past and I believe that I had to consider that at the time I granted Mr. Cook his request to represent himself in this matter. I have had an opportunity to see Mr. Cook during the conduct of his trial. I believe that he did what I would consider to be a relatively good job of representing himself in this case. In fact, I even feel he probably did a better job representing himself than some attorneys that I have seen practice in front of me and that fact simply reinforces my impression that whatever prior mental problems that the Defendant has had are in the past; that they did not directly impact upon the commission of these murders and that, just as a side comment, they did not in the least affect his ability to make the decision to waive counsel in this case or to effectively represent himself.

(Id. at 19-20.)

The Arizona Supreme Court affirmed the trial court's handling of the mitigation issues:

> The trial court's ruling that the evidence of intoxication and mental problems was insufficient to establish significant impairment of Cook's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law was based on the trial judge's assessment of the weight and credibility of the evidence before him. Consequently, we defer to his conclusion.

> Our review, however, does not end here. We have previously held that even if the trial court does not find sufficient evidence to establish the § 13-703(G)(1) mitigating circumstance of "insufficient capacity," the court must further review all of the evidence for any independent mitigating effect that suggests in some way that the defendant be treated with leniency.

> We are satisfied from the record that the trial judge's consideration of the evidence of Cook's mental history was sufficient to have identified any independent mitigating circumstance weighing in favor of leniency.

Cook, 170 Ariz. at 64, 821 P.2d at 755 (citations omitted).

This Court agrees with the Arizona Supreme Court's conclusion that the trial court adequately considered information concerning Petitioner's mental history when it rendered

49

its sentencing decision.  As the Ninth Circuit has noted, "the trial court need not exhaustively analyze each mitigating factor 'as long as a reviewing federal court can discern from the record that the state court did indeed consider all mitigating evidence offered by the defendant.'" Moormann v. Schriro, 426 F.3d 1044, 1055 (9th Cir. 2005) (quoting Clark v. Ricketts, 958 F.2d 851, 858 (9th Cir. 1991)); see Parker v. Dugger, 498 U.S. 308, 314, 318 (1991) (it was sufficient for the sentencing court to state that it considered all the evidence and found no mitigating circumstances that outweighed the aggravating circumstances); LaGrand v. Stewart, 133 F.3d 1253, 1263 (9th Cir. 1998); Gerlaugh v. Stewart, 129 F.3d 1027, 1044 (9th Cir. 1997).  Therefore, "if there is a finding that the sentencing court gave due consideration to all mitigating evidence, . . . it is unnecessary for the court specifically to discuss the cumulative weight of the evidence."  Ortiz, 149 F.3d at 943.

The trial court sentenced Petitioner pursuant to A.R.S. § 13-703(G), which provides:

> The trier of fact shall consider as mitigating circumstances any factors proffered by the defendant or the state that are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense, including but not limited to the following [enumerated factors] . . . .

Under this provision the sentencer must consider, along with the "insufficient capacity" factor of § 13-703(G)(1), all other relevant mitigating evidence, including "any *independent* mitigating circumstance" arising from Petitioner's mental history.  Cook, 170 Ariz. at 64, 821 P.2d at 755 (emphasis added) (citing State v. McMurtrey (McMurtrey I), 136 Ariz. 93, 102, 664 P.2d 637, 638 (1983)).  The Arizona Supreme Court concluded that the trial court applied the evidence regarding Petitioner's mental health to both the "insufficient capacity" factor, as to which the trial court found that there was not a causal connection between Petitioner's mental problems and the commission of the crimes, and to any independent grounds for leniency.  Id.

In carrying out its habeas analysis this Court presumes that "state courts follow the law, even when they fail to so indicate." Jeffers v. Lewis, 38 F.3d 411, 415 (9th Cir. 1994); see Visciotti, 537 U.S. at 24.  At the time of Petitioner's conviction it was "well settled that

a judge should consider any evidence of mental impairment to mitigate capital punishment."[23] State v. Fierro, 166 Ariz. 539, 553, 804 P.2d 72, 86 (1990) (citing Lockett and McMurtrey I, 136 Ariz. at 102, 664 P.2d at 638); see State v. Lopez, 175 Ariz. 407, 414-16, 857 P.2d 1268-70 (Ariz. 1993). Therefore, when the trial court sentenced Petitioner, it was clear that for mitigation purposes evidence of mental impairment included information which failed to meet the criteria set forth in § 13-703(G)(1) but "which in some other way suggests that the defendant should be treated with leniency." Id. (quoting McMurtrey I, 136 Ariz. at 101, 664 P.2d at 646).

The record indicates that the trial court was aware of and followed its obligation to consider in mitigation any relevant aspect of Petitioner's character or background, not merely those specifically enumerated in the statute. The fact that the court found no connection between Petitioner's documented mental health history and the commission of the crimes reflects the court's assessment of the weight to be accorded to Petitioner's mental background as a mitigating circumstance. Therefore, Petitioner has failed to rebut the presumption that the trial court correctly implemented § 13-703(G) when it considered and rejected Petitioner's mental history as a mitigating circumstance.

Finally, the Court also notes that in death penalty cases the Arizona Supreme Court undertakes an "independent review [of] the aggravating and mitigating factors found by the trial court to ensure that they were properly determined and weighed." Fierro, 166 Ariz. at 549, 804 P.2d at 82. After carrying out this review in Cook, and applying the principles set forth in Fierro and McMurtrey I, the Arizona Supreme Court rejected Petitioner's contention that his "mental history demands or even justifies leniency, especially when balanced against

---

[23]  Prior to Lockett, Arizona's death penalty statute, A.R.S. §13-454, enumerated certain mitigating factors but did not contain a catch-all provision. In State v. Watson, 120 Ariz. 441, 586 P.2d 1253 (1978), the Arizona Supreme Court held that §13-454, with its restriction on the consideration of mitigating factors outside those specified in the statute, did not satisfy Lockett. Shortly after Watson, the Arizona legislature amended the mitigation portion of the death penalty statute to conform with Lockett by requiring the sentencer in a capital case to consider any relevant mitigating information. A.R.S. § 13-703(G).

the aggravating factors found to be present in this case." Cook, 170 Ariz. at 64, 821 P.2d at 755. Petitioner has failed to meet his burden of showing that the court's independent assessment of the mitigating and aggravating factors was objectively unreasonable.

Despite the fact that Petitioner chose to present no mitigation evidence, the trial court took into account the entirety of the record, which included information about Petitioner's background of mental difficulties. See Moormann, 426 F.3d at 1055 (the trial court sufficiently considered defendant's mitigation evidence, even that which the defendant did not expressly argue, where it explicitly stated that it had considered all information contained in the trial and sentencing record). Having considered such mitigation evidence, which went beyond that proffered by Petitioner, the trial court fulfilled its constitutional duty under Lockett and Eddings. The fact that the court found the evidence "inadequate to justify leniency . . . did not violate the constitution." Ortiz, 149 F.3d at 943.

The state courts' assessments of mitigating and aggravating factors, the former including evidence of Petitioner's history of mental health problems, was neither an unreasonable application of, nor contrary to, Supreme Court law. Therefore, Petitioner is not entitled to habeas relief on Claim 16.

**Claim 21:    The failure of the trial court and the prosecutor to notify Petitioner that the multiple-homicide aggravating factor would be asserted against him violated Petitioner's right to due process under the Fourteenth Amendment.**

Petitioner asserts that the failure to notify him that the multiple-homicides aggravator, as set forth in A.R.S. § 13-703(F)(8), would be asserted against him at sentencing violated his right to due process.[24]

When the prosecution filed its presentencing memorandum, there was no notification that the State would claim multiple homicides as an aggravating circumstance. Three days

---

[24]   A.R.S. § 13-703(F)(8) provides: "The trier of fact shall consider the following aggravating circumstances in determining whether to impose a sentence of death: . . . The defendant has been convicted of one or more other homicides . . . that were committed during the commission of the offense."

before sentencing, on August 5, 1988, the prosecution filed its sentencing memorandum with the trial court. (R.O.A. 112.) The prosecutor indicated that the State would rely on proof of two aggravating circumstances, that the Cruz Ramos murder was committed for pecuniary gain and that both murders were committed in an especially heinous, cruel, or depraved manner. (Id.) At the sentencing hearing, the trial court questioned the prosecutor about the applicability of the multiple-homicide aggravating circumstance, asking whether the circumstance was overlooked or whether the prosecutor believed that it did not apply. (R.T. 8/8/88 at 7.) The prosecutor indicated that it had simply been overlooked. (Id.) Based on this exchange the trial court asked Petitioner if he had anything he wanted to add. (Id.) Petitioner did not object to the trial court's consideration of the multiple-homicide aggravator or request a continuance. (Id.) The court then found that factor (F)(8) was applicable. (Id. at 15.)

The Arizona Supreme Court concluded that the short notice provided to Petitioner satisfied due process:

> Cook neither objected to the court's consideration of § 13-703(F)(8) nor requested a continuance. In addition, the fact of Cook's two murder convictions was evident from the verdict itself, so there was nothing for Cook to rebut. Under these circumstances, it is obvious that the prosecutor's failure to notify Cook about this aggravating circumstance did not prejudice Cook in any way.
>
> Cook's contention that the two murders were not sufficiently factually related to establish the § 13-703(F)(8) aggravating factor is without merit. The two murders were committed during "a continuous course of criminal conduct." Swaney was detained because he had been shown the corpse of Cook and Matzke's first victim. He was then sodomized and murdered because Cook and Matzke decided they could not let him go after what he had seen. The trial court found that "even though there were perhaps a couple of hours that separated the murders . . . they were for all practical purposes committed at the same time and [in] one continuous course of conduct." We agree.

Cook, 170 Ariz. at 63, 821 P.2d at 754 (citations omitted).

On habeas review the Court must determine whether this ruling was contrary to or involved an unreasonable application of United States Supreme Court precedent.

Petitioner relies upon Lankford v. Idaho, 500 U.S. 110 (1991), to argue that he was

constitutionally entitled to fair notice that the multiple-homicide aggravator would be utilized against him at sentencing.  In <u>Lankford</u> the State advised the defendant in a presentencing order that it would not be seeking the death penalty.  <u>Id.</u> at 115.  During the sentencing hearing, there was no discussion of the death penalty as a possible sentence, and the defendant argued only the merits of various terms of imprisonment.  <u>Id.</u> at 116.  The trial court, *sua sponte,* sentenced the defendant to death.  <u>Id.</u> at 117.  On direct review, the Supreme Court reversed the defendant's death sentence, holding that the defendant was denied due process because he did not have adequate notice that the judge contemplated the imposition of the death sentence.  <u>Id.</u> at 126-27.

In <u>Lankford</u>, the Court discussed the purpose of the notice requirement, observing that due process for a defendant requires "notice of the case against him and opportunity to meet it." <u>Lankford</u>, 500 U.S. at 121 (further citation omitted). At issue is whether <u>Lankford</u> was unreasonably applied by the Arizona Supreme Court when it ruled that short notice of an additional aggravating circumstance satisfied due process because Petitioner could have offered no rebuttal, did not ask for a continuance, and was not prejudiced.  <u>See</u> <u>Cook</u>, 170 Ariz. at 63, 821 P.2d at 754.

The facts in <u>Lankford</u> are readily distinguished from those at issue here.  In <u>Lankford</u>, the defendant did not have an opportunity to present his case for a life sentence rather than the death penalty because he did not know that his presentence hearing was a death penalty proceeding.  Here, Petitioner had notice that he faced the death penalty and thus had a full opportunity to present mitigating evidence at his sentencing hearing.  The only issue is whether the amount of notice provided to Petitioner satisfied due process.

The Court concludes that notice provided to Petitioner satisfied due process. Petitioner was given an opportunity to advance arguments against the multiple-homicide circumstance; he chose not to do so and did not ask for a continuance.  Further, short notice of an additional aggravating circumstance is sufficient to satisfy due process when there is no evidence available to rebut the aggravating circumstance.  Because Petitioner had already

been convicted of committing multiple homicides arising out of the same course of conduct, there was no evidence to rebut the additional aggravating circumstance. Because due process was satisfied, the Arizona Supreme Court did not unreasonably apply Lankford.

Even if the trial court had violated Petitioner's due process rights by considering the aggravating factor despite the absence of adequate notice, Petitioner is unable, for the reasons discussed above, to establish that the court's error had a "substantial and injurious effect or influence" on the outcome of the case. Brecht, 507 U.S. at 638; see Hoffman v. Arave, 236 F.3d 523, 540-41 (9th Cir. 2001). There is no doubt that the factor was proved, and Petitioner has not suggested that if he had received greater notice he would have been able to offer further arguments or additional evidence to contest the multiple-homicides factor.

Petitioner is not entitled to habeas relief on Claim 21.

## EVIDENTIARY DEVELOPMENT

In his amended petition Petitioner requested permission to utilize the processes of discovery and asked the Court to hold an evidentiary hearing to resolve any factual disputes raised by Respondents' Answer. (Dkt. 18 at 54-55.) In his merits brief Petitioner did not request evidentiary development of any specific factual issue. (Dkts. 69, 85.) The Court concludes, after reviewing the record, that none of Petitioner's claims warrant evidentiary development because the allegations, even if true, do not entitle Petitioner to habeas relief.

## CONCLUSION

The Court finds that Petitioner has failed to establish entitlement to habeas relief on any of his claims. The Court further finds that an evidentiary hearing in this matter is neither warranted nor required.

Accordingly,

**IT IS HEREBY ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus (Dkt. 18) is **DENIED WITH PREJUDICE.** The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that the stay of execution entered by this Court on

55

1   January 24, 1997, is **VACATED.**

2       **IT IS FURTHER ORDERED** that the Clerk of Court send a courtesy copy of this

3   Order to Noel Dessaint, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix,

4   Arizona 85007-3329.

5       DATED this 28th day of March, 2006.

        _____
        Robert C. Broomfield
        Senior United States District Judge

56